NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BROOKWOOD FURNITURE, DIVISION OF U.S. INDUSTRIES, Respondent.

No. 81–4475.

United States Court of Appeals, Fifth Circuit.

March 28, 1983.

454

Elliott Moore, John P. Coyle, Deputy Associate Gen. Counsels, N.L.R.B., Washington, D.C., for petitioner.

Frank M. Holbrook, Emile C. Ott, Jackson, Miss., for respondent.

Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order, 258 N.L.R.B. No. 28 (1981), adopting the findings and conclusions of the Administrative Law Judge,[1] that Brookwood Furniture Company, Division of U.S. Industries, violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by threatening and interrogating various employees as to union activities, and Sections 8(a)(3) and (1), 29 U.S.C. § 158(a)(3), (1), by reprimanding and discharging one employee and by discharging another employee because of their union activities. Brookwood resists enforcement, arguing that the Board's order is not supported by substantial evidence on the record considered as a whole and that it was improperly denied access to exculpatory material within the Board's investigatory files. We disagree and grant enforcement of the Board's order.

### Background Facts

On September 28, 1978, the Upholsterers International Union of North America, AFL–CIO, filed a petition with the Board requesting a representation election at Brookwood's Pontotoc, Mississippi furniture manufacturing plant. Thereafter, on October 19, 1978, an appropriate bargaining unit was certified.[2] The representation election was held on December 1, 1978, resulting in a vote of 334 to 120 against the union.

Following the election, the union filed unfair labor practice charges against Brookwood[3] as well as objections to the election based on the company's pre-election conduct. After investigation, an unfair labor practice complaint issued against Brookwood which was consolidated for hearing with the union's election objections.[4] A hearing was held before the Administrative Law Judge (ALJ) in November and December 1979.[5]

On April 14, 1980, the ALJ issued his findings of fact and conclusions of law. The ALJ found, as here relevant, approximately twelve instances of employee interrogation and threats by Brookwood in violation of Section 8(a)(1) of the Act.[6] Additionally, the ALJ held that Brookwood violated Section 8(a)(3), as well as Section 8(a)(1), by discharging employee Jerry Wray and by reprimanding and discharging employee Kawonies McElhenney because of

1. The Board adopted the Administrative Law Judge's findings in toto, except for a few minor points not at issue on appeal.

2. The Board's Regional Director approved a stipulation for Certification Upon Consent election entered into by Brookwood and the union. The "appropriate unit" certified for collective bargaining included:

All production and maintenance employees, including floaters, leadmen, local and over-the-road truck drivers and quality control employees employed at the Company's Plants 1 and 4, located at 175 Industrial Drive, Pontotoc, Mississippi, and all samplers and shippers employed at the Company's warehouse located at 263 Brookwood Drive, Pontotoc, Mississippi, excluding all office clerical, technical and professional employees, industrial engineers, guards, watchmen and supervisors as defined in the Act.

3. On December 1, 1978, the day of the election, the union filed the first in a series of unfair labor charges which are the subject of the proceedings at issue. These charges alleged both pre- and post-election unfair labor practices.

4. The Board's election objection rulings did not result in a final order. Accordingly, these determinations are not before us on appeal. See TRW-United Greenfield Division v. NLRB, 637 F.2d 410, 415 n. 2 (5th Cir.1981); Hendrix Manufacturing Co. v. NLRB, 321 F.2d 100, 106 (5th Cir.1963).

5. The hearing opened on November 5th, and continued on November 8, 9, 14, 15 and 16, and December 3, 4 and 5, 1979. Over 1,700 pages of testimony were recorded.

6. In three of these instances, the ALJ found a violation, but failed to specify how the Act was violated. The Board, in adopting the ALJ's findings, added its conclusion that Brookwood's action in these three cases constituted implied threats which tended to coerce employees in the exercise of their § 7 rights.

In several additional cases, objectionable conduct was found to exist but, as concluded by the Board, could not be held to result in unfair labor practices because the complaint did not include these instances in its allegations.

Approximately 20 § 8(a)(1) violations were alleged and litigated.

their union activities.[7] The Board, in adopting the ALJ's recommendations, issued a cease and desist order and ordered that employees Wray and McElhenney be reinstated with back pay. Brookwood appeals all but two of the Board's findings of unfair labor practices.[8]

### Section 8(a)(1) Violations

As this Court has had frequent occasion to emphasize, our role in reviewing NLRB orders is narrowly limited. The factual determinations, underlying the Board's order, may not be disturbed unless "after full review of the record, we are unable conscientiously to conclude that the evidence supporting the Board's decision is substantial." *NLRB v. Mueller Brass Co.,* 509 F.2d 704, 707 (5th Cir.1975). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Gulf States United Telephone Co.,* 694 F.2d 92, 95 (5th Cir.1982); *Berry Schools v. NLRB,* 653 F.2d 966, 969 (5th Cir.1981). As we have similarly explained: "When the board's findings are reasonable and supported by substantial evidence, a court will affirm them, though the court might well have made contrary findings if sitting *de novo.*" *Dow Chemical Co. v. NLRB,* 660 F.2d 637, 643 (5th Cir.1981). Particularly where, as here, the record is fraught with conflicting testimony, requiring essential credibility determinations to be made, the trier of fact's conclusions must be accorded particular deference. *See NLRB v. Gulf States United Telephone Co., supra,* 694 F.2d at 96; *NLRB v. Southern Plasma Corp.,* 626 F.2d 1287, 1293 (5th Cir.1980).

In contrast, the legal effect ascribed to a given set of facts by the Board is subject to somewhat greater, although still limited, scrutiny on review. "The NLRB's resolution of such questions is to be upheld if reasonable, consistent with the Act, and based on findings supported by substantial evidence." *NLRB v. L.B. Priester & Son, Inc.,* 669 F.2d 355, 359 (5th Cir.1982). Thus, while we may not abdicate our responsibility to conduct a thorough review, pursuant to the NLRA, of the reasonableness of the legal implications which the Board draws, neither may we overturn the Board's attribution of legal effect to a given set of facts unless we are convinced of the Board's error. After all, "Congress has, in the first instance, entrusted the detailed implementation of the NLRA to the Board, which has deliberately been given considerable leeway in applying its expertise to the myriad factual situations that come before it daily." *NLRB v. Southwestern Bell Telephone Co.,* 694 F.2d 974, 976 (5th Cir.1982).

We turn now to the case at hand. We have examined the voluminous record before the Board upon which it found a dozen violations of Section 8(a)(1), out of the twenty-odd violations originally alleged and argued. We have conducted this review with an eye towards the entire period of disputed conduct preceding and following the representation election. Only upon this broad backdrop can the Board's specific findings of fact and their legal effects be assessed. After conducting this examination, utilizing the standards of review set out above, we cannot find error in the Board's conclusion that Section 8(a)(1) had been violated by Brookwood's employee interrogation and threats.

### A. Factual Findings

We summarize the circumstances giving rise to the Board's conclusion of Section 8(a)(1) violations, as found by the ALJ and supported by substantial evidence on the

---

7. The ALJ found that five § 8(a)(3) violations had been committed in Brookwood's disciplinary action towards employees Wray and McElhenney. More than 40 allegations of § 8(a)(3) violations were made and litigated at the hearing below.

8. Brookwood does not except to the finding that the following two incidents amounted to § 8(a)(1) violations: (1) a supervisor asking an employee, after the election petition was filed, whether he knew anyone going around getting union authorization cards signed; and (2) a post-election reprimand, placed in one employee's personnel file, because the employee had told the supervisor that he intended to file charges against him with the Board.

record as a whole.[9] We include a listing of those specific events giving rise to violations.

In late July or early August, 1978, the union began its organizational drive at Brookwood.

1. In late August, Terry Chewe, the company's Assistant Personnel Manager and Safety Director, asked to speak with button installer McElhenney at the latter's work station; McElhenney was a known and active, early adherent to the union. When McElhenney asked whether the discussion concerned the union, Chewe responded that he wanted to talk about a petition McElhenney had circulated [10] and which had been signed by over half of the Cushion Department employees, the department in which McElhenney worked. Chewe told McElhenney that his circulation and submission of the petition demonstrated a "negative attitude" which would hinder his advancement at Brookwood, adding that McElhenney had great potential if he would change his attitude. Then Chewe asked: "What about a Union?" McElhenney responded: "I am in the process of organizing something to that effect here."

2. On August 30, Cliff Hamblin, supervisor of Brookwood's Upholstery, Packing, and Supply Departments, called C.W. Ivy, a Supply Department employee, into his office for a job evaluation interview. Once this was completed, Hamblin asked Ivy what he thought of the union. When Ivy

responded that he did not know, Hamblin further questioned what motivated employees to unionize—more money, better jobs or something else. Hamblin remarked that if the union could live up to its promises he himself would support the union. Then Hamblin warned Ivy that if the latter repeated these comments, he would deny them.

3. On September 6, Supervisor Hamblin approached upholsterer Jimmy Lessel at Lessel's work station, and said: "I heard a rumor that a Union is trying to come in." After Lessel denied knowledge of any union efforts, Hamblin stated that he had "gotten into trouble" over a union a few years before when working for his previous employer, and concluded with the observation that he saw nothing a union could accomplish at Brookwood.

4. Towards the end of September, line foreman Ronnie Wise approached upholsterer Jerry Wray at Wray's work station and stated he had heard that Wray was "tied up" in the union. After Wray denied his involvement with the union, Wise responded that he knew Wray was "fixing to get his ass in trouble."

The union filed its petition for a representation election on September 28th.

5. Shortly thereafter, Supervisor Hamblin approached Upholstery Department employee Albert Gordon, and asked if Gordon

**9.** We are not persuaded by Brookwood's alternative implications that the ALJ's factual determinations should be overturned because: (1) the ALJ found relatively few violations among the many § 8(a)(1) and (3) violations alleged to have occurred, and therefore it is improbable that *any* violative conduct in fact transpired; and (2) the ALJ erroneously credited the witnesses against the company, and discredited those testifying on behalf of the company. As to the first implication, we find that the ALJ's findings are in no way undercut merely because he conscientiously examined each alleged instance of violative conduct and found a fairly sizeable number, however disproportionately few, violative and properly alleged and argued for consideration; in any event, we question Respondent's characterization of twelve § 8(a)(1) and five § 8(a)(3) violations as relatively few, even when measured against the

twenty and forty-odd violations, respectively, alleged.

As to the second implication, we find no compelling or unusual circumstances that might justify upsetting the ALJ's credibility determinations. The ALJ did not credit or discredit all witnesses for either side; rather, he carefully, consistently, and reasonably explained his evaluation of the witnesses' testimony in light of their demeanor. *Cf. Delco-Remy Division, General Motors Corp. v. NLRB,* 596 F.2d 1295, 1304 (5th Cir.1979) ("unusual circumstances" permitting a reviewing court to discount ALJ's credibility determinations include findings which are "inherently unreasonable or self-contradictory" or "based on an inadequate reason, or no reason at all").

**10.** The petition, submitted to the company, requested a raise for the plant janitor.

knew who was soliciting signatures on union authorization cards. Gordon denied any knowledge.[11]

6. In early October, Hamblin asked Joe Dixon, a leadman in the Packing Department, to go with him to inspect some cartons. Hamblin then told Dixon that, because he was a leadman, he could not "afford" to vote for the union.

The union mailed the company a letter, on October 25, identifying fifteen employees as members of the union's in-plant organizing committee. The list included five individuals—McElhenney, Wray, Dixon, Charlie Swords, and Loretta Washington— involved in the unfair labor practice violations found by the Board.

During the last three weeks of November, company President Tracy Buse delivered to his employees a series of three different speeches opposed to the union. These speeches were given in a conference room adjacent to the personnel office to groups of 30 to 45 employees and on company time.[12] The three different presentations were repeated seven or eight times each, to ensure that each employee heard each speech once. After the conclusion of each speech, company supervisors interviewed employees to ascertain their reactions.

7. On several occasions, beginning in early November, Sewing Department supervisor Joyce Churchill asked employee Barbara Hooker what the latter thought of the union. Each time, Hooker responded that she "didn't know."[13] On one occasion, Churchill advised Hooker that she "had better think about it, that [she] had better think about [her] job."

8. During the second week of November, Upholstery and Cabinet Department supervisor Paul Hall[14] said to upholsterer Charlie Swords that he was surprised to hear that Swords was on the union in-plant committee. Swords explained that he had been asked to help run the campaign. In turn, Hall remarked that the company would win the election, and he was "afraid" Swords would "get into trouble."

9. The following week, Bo Weatherly, Shipping and Maintenance Department supervisor, summoned department employee Charles Washington into the warehouse. Weatherly then stated his understanding that Washington's wife, Loretta, was on the plant committee and asked whether Washington could do anything to change his wife's mind. Weatherly then showed Washington some material concerning another company, within the area in which Brookwood was located, which was organized. He indicated that the union would be of no assistance to the employees. He added in particular, the union would not change the company overtime policy, a matter which concerned a number of employees.

10. At the end of November, supervisor Weatherly engaged David Heard, a Shipping Department employee, in a discussion outside the personnel office. Weatherly asked Heard why he had attended a union meeting. Heard responded that he had wanted to "know what was going on." Weatherly concluded that if that were so, Weatherly did not blame him for attending. Shortly after this conversation was held, Benny Parker, a Shipping Department supervisor, echoed Weatherly's question to Heard as to why he had attended the union meeting. Heard gave Parker the same response he had given Weatherly.[15]

11. In fact, however, Gordon himself had solicited signatures.

12. In this connection, we note that those employees who were members of the in-plant union committee were prohibited from attending these company speeches.

13. Hooker had, in fact, signed a union authorization card in August.

14. Hall supervised four foremen in the Upholstery Department and two foremen in the Cabinet Department.

15. The ALJ had found both Weatherly and Parker's questioning violative of the Act. The Board agreed but held that Weatherly's conduct could only be considered with respect to the election objections, and not as a basis for finding a § 8(a)(1) violation since the ALJ had denied General Counsel's motion to amend the

On December 1, the representation election was held.

11. On the day of the election, supervisor Hall approached McElhenney and asked him how he thought the election would turn out. When McElhenney professed uncertainty, Hall asked him what good he thought the union would do. McElhenney responded that he believed the union would eliminate favoritism towards various employees. Hall then said that he, too, did not know how the election would turn out. He stated that he had spoken to one employee, and "the son of a bitch" will say he's for the company one day and the union the next. He continued, that he didn't know what to think about them "son of a bitches" on the line. Hall concluded the conversation by remarking that regardless of the election outcome, there would be some changes, and they would begin with Hall.

12. On December 15, line foreman Billy Cornett issued a reprimand to upholsterer Jimmy Lessel. Although the reprimand form cited "bad quality," it elaborated that Lessel was reprimanded for threatening to file a charge with the Board concerning Cornett.

The company closed down operations for the holidays, from approximately December 17 until January 3, 1979. After reopening, employees Wray and McElhenney received a number of reprimands, culminating in their discharges on March 8 and 9, respectively. The circumstances surrounding the discipline and discharge of these employees—which were held by the Board to give rise to Section 8(a)(3) violations, as well as Section 8(a)(1) violations—will be discussed below under a separate heading.

### B. Standard

■ Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the free exercise of their Section 7 rights.[16] "The test for determining whether an employer has violated § 8(a)(1) is whether the employer's questions, threats, or statements tend to be coercive, not whether the employees are in fact coerced." *TRW-United Greenfield Division v. NLRB,* 637 F.2d 410, 415 (5th Cir.1981). *See Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 414 (5th Cir.1981); *Sturgis Newport Business Forms, Inc. v. NLRB,* 563 F.2d 1252, 1256 (5th Cir.1977). The coercive tendencies of an employer's conduct must be assessed within the totality of circumstances surrounding the occurrence at issue. *TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 415–16; *NLRB v. Laredo Coca Cola Bottling Co.,* 613 F.2d 1338, 1342 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). This assessment "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969).

### C. Threats

■ Four instances of employee threats, in violation of Section 8(a)(1), are on appeal: the conduct listed as numbers 1, 4, 6, and 8 above.[17] An unlawful threat is established if, under the totality of the circumstances, "the employees could reasonably conclude that the employer is threatening economic reprisals if they support the Union." *Hendrix Manufacturing Co. v. NLRB,* 321 F.2d 100, 105 (5th Cir.1963). After conducting such an examination, we find the Board's conclusions reasonable and proper under the Act.

---

unfair labor practice complaint to include Weatherly's conduct towards Heard.

**16.** Section 7, 29 U.S.C. § 157, guarantees employees the right "to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of ... mutual aid or protection."

**17.** Brookwood does not appeal the Board's finding that the conduct described in listing 12, above, constituted an unlawful threat.

The Board could reasonably conclude that Chewe's warnings to McElhenney, regarding the latter's petition, his "negative attitude," and that his actions would hinder prospects for advancement in the company,[18] constituted an implied threat of economic reprisal should McElhenney pursue his concerted activities. These warnings occurred shortly after the commencement of the union organizing campaign and were immediately followed by Chewe questioning McElhenney—an early and active union adherent—about the union.

Similarly, foreman Wise's admonition to Wray[19] that the latter was "fixing to get his ass in trouble" if he became involved with the union—supervisor Hamblin's warning to leadman Dixon[20] that he could not "afford" to vote for the union—and supervisor Hall's statement to Swords[21] that he was "afraid" Swords would "get into trouble" because of his union support—were also reasonably held to be implied threats of reprisal for union activities in violation of Section 8(a)(1). These statements were made in the context of "a vigorous, sometimes illegal antiunion campaign," as found by the ALJ. When placed in this kind of setting, coercive effects of statements may well be heightened. *See, e.g., NLRB v. Kaiser Agricultural Chemicals, Division of Kaiser Aluminum & Chemical Corp.,* 473 F.2d 374, 381 (5th Cir. 1973); *Hendrix Manufacturing Co. v. NLRB, supra,* 321 F.2d at 103–04. We conclude that the Board's finding that the above four occurrences amounted to coercive threats in violation of Section 8(a)(1) of the Act is reasonable. Its order to that effect is therefore entitled to enforcement.

### D. *Interrogation*

Six instances of employee interrogation found by the Board to violate the Act are presented on appeal: the conduct listed as numbers 2, 3, 7, 9, 10 and 11.[22] Questioning of employees as to union activities is not illegal *per se.* Rather, Section 8(a)(1) violation occurs if, under the totality of the circumstances, the interrogation tends to coerce employees in the exercise of their Section 7 rights. This Court has identified a number of factors to be considered in determining whether a particular instance of questioning tends to be coercive: 1) the history of the employer's attitude toward its employees; 2) the nature of the

18. This incident is related in listing 1 above.

19. *See* listing 4 above. It appears from the record that Wise and Wray were first cousins. The simple fact of this blood relationship does not, in and of itself, preclude a finding that Wise's comments constituted an unlawful threat as found by the Board. *See, e.g., NLRB v. Delchamps, Inc.,* 653 F.2d 225, 227–28 (5th Cir.1981); *NLRB v. Sunnyland Packing Co.,* 369 F.2d 787, 789 n. 3 (5th Cir.1966). The Board could properly consider this relationship as but one of many factors relevant to determining whether the Wise-Wray discourse was coercive, given Wise's managerial status.

While Wise was not Wray's supervisor, and despite any inferences which might be drawn from the family relationship, we find that the Board's conclusion that the substance and surrounding circumstances of the conversation objectively tended to show coercion is reasonable.

20. *See* listing 6 above. Brookwood's contention, that Hamblin's remark is "clearly the type ... within the ambit of § 8(c)," and thus protected speech, is without merit. The statement to Dixon, who was on the union plant committee, that he "couldn't afford" to vote for the union was neither the casual, typical electioneering remark protected by § 8(c) nor an ambiguous, non-threatening statement as the company contends.

21. *See* listing 8 above. We are not convinced by Brookwood's argument here that Hall's statements were ambiguous and unrelated to the outcome of the election, so as to render the Board's finding of coercion unreasonable. To the contrary, the Board could reasonably conclude that an employee might well perceive economic reprisal in the offing should he disregard his supervisory's warning that if he supported the union he would "get into trouble." Finally, as in the case of the familial relationship between Wise and Wray, the fact that Swords and Hall may have desired to remain friends after the election does not preclude or render unreasonable the Board's finding that a coercive threat had occurred. *See NLRB v. Delchamps, Inc.,* 653 F.2d 225, 227–28 (5th Cir. 1981); *NLRB v. Sunnyland Packing Co.,* 369 F.2d 787, 789 n. 3 (5th Cir.1966).

22. A seventh incident of interrogation, listed as number 5 above and found to violate § 8(a)(1) of the Act, is not contested on appeal.

information sought; 3) the rank of the questioner in the employer's hierarchy; 4) the place and manner of the conversation; 5) the truthfulness of the employee's reply; 6) whether the employer had a valid purpose in obtaining the information sought about the union; 7) whether a valid purpose, if existent, was communicated to the employee; and 8) whether the employer assured the employee that no reprisals would be forthcoming should he or she support the union. *See TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 416; *Paceco v. NLRB,* 601 F.2d 180, 183 (5th Cir.1979); *Delco-Remy Division, General Motors Corp. v. NLRB,* 596 F.2d 1295, 1309 (5th Cir.1979); *NLRB v. Camco, Inc.,* 340 F.2d 803, 804 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). As we have previously noted, however, exhaustive and coercive interrogation may still be found to have occurred even if all the above enumerated factors operate in the employer's favor. *See TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 416; *Sturgis Newport Business Forms, Inc. v. NLRB, supra,* 563 F.2d at 1256. After examining the asserted violative instances of interrogation at issue in the light of the above legal principles, we find that substantial evidence supports the Board's determination. The questioning at issue tended to be coercive, and this conclu-sion was reasonably reached under the Act.[23]

As in *TRW-United Greenfield Division v. NLRB, supra,* we do not find the absence of prior history of unfair labor practices at Brookwood to be a compelling factor in its favor. During the time period at issue, as was the case in *TRW,* the company engaged in a systematic effort to ascertain the employees' sympathies toward the union. Three different speeches were systematically repeated over the course of three weeks by the company president, seven or eight times each, to groups of 35 to 40 employees. These speeches expressed the company's view that unionization would, if anything, work to the employees' detriment. After these speeches, company supervisors interviewed employees on their reactions upon leaving the conference room, which was adjacent to the personnel office. We have held that "[r]epeated efforts by an employer to determine who supports the union, coupled with employer opposition to the union, may be considered as background when determining whether a conversation tends to be coercive." *TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 417. *See Sturgis Newport Business Forms, Inc. v. NLRB, supra,* 563 F.2d at 1257.

Turning to the six instances at issue, the information sought during questioning tended to be moderately coercive in nature. In two cases the employees were asked

---

**23.** Brookwood contends that the ALJ's decision, as adopted by the Board, is too conclusory in its findings of unlawful interrogation—in failing to set forth the legal standards by which it determined coerciveness—so as to preclude review. In support of its position, it cites *Paceco v. NLRB,* 601 F.2d 180 (5th Cir.1979), in which we remanded to the Board for further findings and conclusions with regard to its determination that coercive interrogation had occurred. While *Paceco* stands for the proposition that sufficient exposition of the facts found and legal standards applicable must be enunciated so as to permit review, this rule does not require remand in the immediate case. First, the *Paceco* rule does not require an exhaustive discourse of the facts found and legal standards applicable; the rule requires "some adequate statement" which "may be brief." Second, we have had occasion to note that even if the Board has not made an essential finding, its order may yet be sustained if the record supports the existence of the omitted finding. *See NLRB v. Turner Tool & Joint Rebuilders Corp.,* 670 F.2d 637, 640 n. 8 (5th Cir.1982); *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 411 (5th Cir.1981); *Delco-Remy Division, General Motors Corp. v. NLRB,* 596 F.2d 1295, 1309–10 (5th Cir.1979).

In the immediate case, the ALJ set forth in exhaustive detail the facts underlying his determinations of coercive interrogation. His recitation of the legal principles, as adopted and amplified by the Board, while not nearly as exhaustive is sufficient to permit review. In some instances the legal principles are more explicit and complete in their enunciation than in others. Yet even in those instances in which the ALJ's explanation might border on the insufficient, substantial evidence in the record more than amply supports his determinations. Thus we find no cause for remand.

their personal views about the union,[24] in a third case an employee was asked whether he could change his wife's known pro-union position,[25] and in a fourth case an employee was asked why he attended a union meeting.[26] These questions are less coercive than, for example, an employer specifically seeking the identities of union advocates. But they are more coercive than are general questions about the union's progress. *See, e.g., TRW-United Greenfield Division v. NLRB,* 637 F.2d at 417; *NLRB v. Camco, Inc., supra,* 340 F.2d at 807. While two of the instances at issue do involve the more casual, general line of questioning,[27] the context in which they occurred and other relevant factors, as we discuss below, show these instances to be coercive also.[28]

In each of the six instances, fairly high level company officials were involved in the questioning.[29] While in most cases the questioning took place in a "neutral location,"[30] in two cases the questioning was undertaken in a place of authority or "unnatural formality." *See NLRB v. Camco, Inc., supra,* 340 F.2d at 804. Employee Ivy was questioned about his union sentiments in supervisor Hamblin's office, when he was called into the office for a job evaluation interview. The potential coercive effect of this interrogation, rendered in tandem with a job evaluation interview, substantially would heighten Ivy's sensitivity to and concern with the questioning. *See TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 417. Similarly, employee Heard's feelings about the union were questioned outside of the personnel office, decidedly not a "neutral" location. In the other instances, set in "neutral" locations, the presence of other factors more than amply support the Board's finding of coerciveness.[31]

Additionally, in each instance the employees gave evasive answers to their supervisors' questions, which objectively indicates possible fear of retaliation against the questioned employee or others if honest and direct answers were given. "If an employee refuses to give a truthful answer even to an innocuous question, the inference of coercion is as strong as if he refused to answer a pointed question." *NLRB v. Camco, Inc., supra,* 340 F.2d at 807.

Further, in none of these instances was there evidence that the official or the company had a valid purpose for inquiring as to the individual employee's knowledge of or sympathy towards union activities. Even if a valid purpose had existed, none was communicated to any employee. Then too, in none of these cases were the employees provided assurances that there would be no reprisals taken against either the questioned employee or the other employees. " 'Questioning is much more likely to have a coercive effect if the purpose of the interrogation is not explained and if there are no assurances against retaliation.' " *TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 417 (quoting *NLRB v. Camco, Inc., supra,* 340 F.2d at 807). In the majority of the instances, not only were there no

24. Listings 2 and 7 above.

25. Listing 9 above.

26. Listing 10 above.

27. Listings 3 and 11.

28. For example, in both these cases the general question about the Union's status was followed by an implied threat.

29. The supervisors involved, while of differing ranks in the company hierarchy, were all above the first supervisory level of foreman. For example, Cliff Hamblin evidently supervised one-half of the plant's manufacturing operations; Paul Hall oversaw one-half of the upholstery and cabinet departments; and Bo Weatherly was shipping and maintenance supervisor of not only the Pontotoc plant but of other company facilities as well. These persons were not the sort of low-level supervisors over whom the company might have little control in their constant face to face relationship with production employees.

30. The questioning of Lessel, Hooker, Washington and McElhenney took place at their work stations or at some other "neutral" plant location.

31. In particular, the questioning of Lessel, Hooker and McElhenney, as discussed *infra,* included an implication of economic reprisals against the employees generally should union support prevail.

assurances against reprisals but also the interrogation was combined with statements which could be viewed as affirmatively warning of economic reprisals: in Hamblin's questioning of Ivy's union beliefs in Hamblin's office after a job evaluation interview;[32] in Hamblin's statement to Lessel, after Lessel denied knowledge of any union activities, that Hamblin had "gotten into trouble" over a union previously;[33] in Churchill's warning to Hooker that she had better think about her job after Hooker had given a noncommittal response to Churchill's questioning of Hooker's thoughts on the union;[34] and in Hall's conclusion of his discussion with McElhenney about the union election, with the warning that changes were going to happen at the company beginning with Hall.[35]

In summary, we find substantial evidence in the record as a whole for the Board's conclusion that these six instances of interrogation violated the Act: 1) supervisor Hamblin's questioning of Ivy, in the former's office after a job evaluation interview, as to the latter's union sentiments; 2) supervisor Hamblin's attempt to elicit information on the union from employee Lessel, who denied any knowledge, and closing comment that Hamblin had "gotten into trouble before" over a union; 3) supervisor Churchill's repeated questioning of employee Hooker as to what Hooker thought of the union, and her remark, after Hooker provided an evasive answer, that Hooker "better think about it ... better think about [her] job;" 4) supervisor Weatherly's questioning of employee Washington as to whether the latter could change his wife's union advocacy, and an attempt to persuade him of the futility of union support after Washington said he could not change his wife's mind; 5) supervisor Parker's questioning of employee Heard's reasons for going to a union meeting, outside of the personnel office, which met with an evasive response; and 6) supervisor Hall's questioning of employee McElhenney as to the latter's thoughts on the outcome of the union election, with aspersions cast towards employees who had equivocated as to their allegiances, and with a conclusion that regardless of the election outcome, changes would be forthcoming and would begin with Hall.[36] The Board's conclusion that these instances demonstrated coercive tendencies in violation of Section 8(a)(1) was reasonable, particularly when viewed in the context of the company's vigorous, systematic, and sometimes illegal antiunion campaign.

### Section 8(a)(3) Violations

The ALJ found that, of the six cases of discriminatory discharge alleged and ar-

---

32. Listing 2 above.

33. Listing 3 above.

34. Listing 7 above.

35. Listing 11 above. Contrary to the Brookwood's implication, the mere fact that McElhenney was a widely-known union adherent does not validate otherwise coercive interrogation: "Although an employee has openly declared his support for the union, the employer is not thereby free to probe directly or indirectly into his reason for supporting the union." *TRW-United Greenfield Division v. NLRB, supra,* 637 F.2d at 418. As stated in *TRW,* in addressing the interrogation of a similarly-known union advocate "if an interrogation is coercive in nature it makes no difference that actual coercion was not achieved in the particular instance." *Id.*

36. In so finding, we note that the peculiar facts of this case are significantly distinguishable from those presented in the cases cited by Brookwood in which this Court refused to grant enforcement of the Board's finding of coercive interrogation. *E.g., Delco-Remy Division, General Motors Corp. v. NLRB,* 596 F.2d 1295 (5th Cir.1979) (the Court found that the questioning was not systematic, that most of the interrogators were low-level supervisors, that management went to great lengths to ensure that supervisors maintained a "hands-off approach" toward the union, that the conversations took place at the employees' work stations, that the questions were general and rather innocuous, and that the employees questioned gave "candid and bold" answers); *Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1250–51 (5th Cir.1978) (the Court found little evidence of antiunion animus, that the questions asked elicited quite general information, that low-ranking supervisors and foremen were involved, that all questioning occurred in an informal and casual atmosphere, that the truthfulness of all replies indicated the questions were not coercive, and that the questions were not asked for the purpose of reprisals, nor did they contain threats of reprisals).

gued, Brookwood violated Section 8(a)(3), as well as Section 8(a)(1), of the Act in two instances: 1) by discharging employee Jerry Wray; and 2) by reprimanding and discharging employee Kawonies McElhenney. The Board adopted the ALJ's conclusion that Brookwood's actions towards Wray and McElhenney were motivated by antiunion animus.

 In reviewing these determinations, we note that the ALJ and the Board may properly rely upon circumstantial as well as direct evidence in drawing inferences as to whether antiunion animus impermissibly motivated an employment decision. *See, e.g., NLRB v. Gulf States United Telephone Co., supra,* 694 F.2d at 95; *NLRB v. Proler International Corp.,* 635 F.2d 351, 356 (5th Cir.1981). Such evidence must support a " 'reasonable inference of causal connection between the employer's anti-union motivation and the employee's discharge.' " *NLRB v. Gulf States United Telephone, Co., supra,* 694 F.2d at 95 (quoting *NLRB v. O.A. Fuller Super Markets, Inc.,* 374 F.2d 197, 200 (5th Cir.1967). While it is true that illegal motive for an employment decision may not be lightly inferred,[37] it is also axiomatic that once the Board has made such an inference, a reviewing court may not lightly displace the Board's factual finding of discriminatory intent. We must pay "special deference" to the conclusion that the employment decision was illegally motivated particularly where, as here, conflicting evidence requires that essential credibility determinations be made. *NLRB v. Southern Plasma Corp.,* 626 F.2d 1287, 1293 (5th Cir.

1980). With the above principles in mind, we turn to our familiar task of determining whether substantial evidence on the record as a whole supports the Board's findings that Brookwood's discharge of Wray and discipline and discharge of McElhenney violated Section 8(a)(3) of the Act. Since we find sufficient evidence in support of these determinations, we grant enforcement to the Board's remedial order, requiring the reinstatement, with back pay, of employees Wray and McElhenney.

### A. *Jerry Wray*

Jerry Wray was employed by Brookwood as an upholsterer for seven years prior to his termination on March 8, 1979—one day before McElhenney's discharge. Wray was an early and active union advocate. As we have already found, he was the recipient of a threat early in the union campaign, in violation of Section 8(a)(1), to the effect that his union activities would get him in "trouble." [38]

The ALJ found that an oral warning for loafing on January 17, and written warnings on February 7 and March 7, 1979, for foul language and poor work quality, respectively, were given for good cause and were not pretextual. The ALJ found that on March 8, Wray's second day of poor quality work, he was discharged.[39] The ALJ determined, over conflicting evidence, that it was company policy to discharge for poor quality only after at least the third written reprimand for bad quality or similar infractions within three consecutive

---

**37.** *See, e.g., NLRB v. Gulf States United Telephone Co., supra,* 694 F.2d at 95; *NLRB v. Southern Plasma Corp.,* 626 F.2d 1287 (5th Cir.1980).

**38.** *See* listing 4 above, in the factual recitation under the § 8(a)(1) violations discussion.

**39.** Wray was summoned to the plant office, near the end of his March 8th shift, by his foreman Charles Williams who had issued the March 7th reprimand for bad work quality. In the office, Williams and Upholstery, Packing, and Supply Supervisor Cliff Hamblin told Wray that he was being terminated because he had failed to improve the quality of his work following the previous day's reprimand. At this

meeting, Williams prepared a "reprimand notice" and written explanation, stating:

> Reason for reprimand: bad quality on 1149 chairs, front stumps not straight, outside arm too loose, pulls in stump, another outside arm too loose. Action taken: terminated— Explained that we were not going to allow this kind of performance out of any employee.
>
> I talked to you yesterday about your quality, and you told me that you would try to improve, but to me you haven't done any better and Cliff [Hamblin] has been on me enough and we discussed it and decided that you should be terminated.

months.[40] The ALJ found that the company offered no reasonable explanation as to why it deviated from customary policy with regard to Wray. The ALJ noted that Wray was discharged upon his second day of poor performance, although he had worked on the job for seven years. He concluded that:

> In view of the timing of Wray's discharge, the departure from established practice, Respondent's animus and its knowledge of Wray's involvement in the union, I find that the evidence supports my finding a violation. The action came upon the heel of the union's organizing campaign at a time when both objections to the election and unfair labor practice charges were pending. Respondent's animus was apparent on the record especially through its activities which I have found violate Section 8(a)(1).

■ We find that the Board, in adopting the ALJ's conclusions, could properly conclude that Wray's discharge was discriminatorily motivated. Having determined that company policy did not provide a legitimate business reason for the discharge, the Board could properly infer that the "moving cause" of Wray's termination was antiunion animus. See NLRB v. Turner Tool & Joint Rebuilders Corp., supra; TRW-United Greenfield Division v. NLRB, supra; Florida Steel Corp. v. NLRB, 587 F.2d 735 (5th Cir.1979). The Board was justified in deciding that the specific circumstances surrounding Wray's discharge, when viewed against the general backdrop of Brookwood's established antiunion animus gave rise to the inference that antiunion animus motivated Wray's discharge.

We find this inference a reasonable one to draw particularly in light of: 1) the timing of the discharge, "upon the heel of the Union's organizing campaign at a time when both objections to the election and unfair labor practice charges were pending," and one day before the discharge of another active, high-profile union adherent, Kawonies McElhenney—for which a legitimate business reason is similarly lacking; 2) the preceding occurrence of a threat of economic reprisal, in violation of Section 8(a)(1), made against Wray should his union adherence continue; and 3) Wray's long tenure as an employee, prior to discharge, without receiving any reprimands for several years preceding the union campaign, a circumstance similar to that involving the other alleged discriminatee, McElhenney.

■ Overt direct evidence of antiunion animus, a rarity at best, is not a prerequisite to a finding of improper motive. Here, circumstantial evidence was presented which permits a reasonable inference that the company's employment decision was based upon antiunion animus. This was not an instance of a "neutral" employment policy, whether "right or wrong." The Board could properly conclude that the discipline taken violated the Act. Appropriate remedial measures, including reinstatement with back pay, properly follow.

---

**40.** A considerable amount of testimony and other evidence, including a company policy manual, focused upon the question of Brookwood's disciplinary procedure. This evidence—seeking to establish the precise disciplinary policy and the flexibility or rigidity with which it was applied, including evidence of prior applications—was in conflict or, at best, nebulous.

Brookwood contends that the ALJ misconstrued company policy and, when tested against the correct policy standard, the discharge of Wray was validly based upon the total number of reprimands he had received since January, both for bad quality and other infractions. We are not persuaded by the company's argument, as we find sufficient evidence in the record to support the ALJ's construction of the much-debated company policy. The company's own witnesses testified that reprimands for dissimilar offenses would not be added together by the company to obtain the three necessary to justify termination; for example, Personnel Manager Ellis Gunthorp testified that two reprimands for bad work quality would not be combined with a reprimand for "eating in unauthorized areas" to justify "the most drastic action" of discharging an employee. While Brookwood accurately can cite evidence in the record in conflict with the ALJ's finding of company policy, we find that sufficient evidence supports the ALJ's determination of company policy and his conclusion that Wray's discharge was in contravention of that policy.

### B. *Kawonies McElhenney*

We similarly uphold the Board's order with regard to discriminatee Kawonies McElhenney. McElhenney had been a button installer in the company's Cushion Department for approximately eight years prior to discharge. He was actively involved in the union campaign. The ALJ found that until January 1979, one month after the union election, McElhenney had never been disciplined for poor work or loafing.[41] After the advent of the union, however, McElhenney received two reprimands for loafing, an oral reprimand on January 4 and a written one on January 25, and a written reprimand for dishonesty, on March 1.[42] In addition to these reprimands, McElhenney received an oral reprimand for poor work early in February.[43] On March 9, McElhenney was called in by his supervisor, who noted McElhenney's poor work in having left buttons off two cushions and McElhenney's prior reprimands. He was terminated at this interview, with his poor work quality and loafing cited as the bases for discharge.

#### 1. *Reprimands*

■ The Board, in adopting the ALJ's findings, concluded that three reprimands—those for loafing, issued on January 4 and 25, and for alleged dishonesty, issued on March 1—were in fact given for pretextual reasons. Further, the Board found that Brookwood's motivation in issuing these reprimands was its antiunion animus, and thus Brookwood had violated Section 8(a)(3) in disciplining McElhenney on those three occasions.

We find sufficient evidence in the record in support of the Board's conclusion. Considerable testimony focused upon the circumstances surrounding the issuance of these three reprimands, as well as upon the

general company policy and practice with regard to the conduct alleged to constitute "loafing" and "dishonesty."

McElhenney testified that on his return to work on January 3, 1979, following the two-week Christmas holiday, he noticed that he was the subject of an unusual amount of surveillance by his foreman Ronnie Gray. On January 4, Gray issued McElhenney a verbal reprimand for "loafing," claiming that McElhenney had been speaking with other employees on the previous day to the exclusion of his work. The evidence established that although employees were admittedly allowed to talk to one another during work if the conversation was work-related, Gray did not attempt to discern the subject of McElhenney's conversations prior to issuing the reprimand. Nor did McElhenney offer any explanation. McElhenney testified that he had thought that explanation of his actions, in connection with the various reprimands, would have been fruitless as he believed he was being reprimanded for his union activities and not on the grounds alleged.

This testimony, considered in the context of the company's vigorous and sometimes illegal antiunion campaign—including the § 8(a)(1) violations directed at this employee—can support the Board's conclusion that "loafing" was not the genuine basis for McElhenney's reprimand. The reprimand could reasonably be found to be part of an effort to build up a sufficient record to discharge McElhenney. *See, e.g., Merchants Truck Line, Inc. v. NLRB,* 577 F.2d 1011, 1016 (5th Cir.1978) (the Board may "attach special weight to timing where the circumstances surrounding discharge would otherwise appear innocent"); *T.I.M.E.— D.C., Inc. v. NLRB,* 504 F.2d 294, 303 (5th Cir.1974) (company's failure to conduct a fair investigation of alleged basis for disci-

---

**41.** McElhenney had been reprimanded twice during his eight years in Brookwood's employ prior to the union election—in April 1975 and January 1977. Neither reprimand related to his job performance.

**42.** The Company closed down operations shortly after the Union election, from December 17, 1978 to January 3, 1979.

**43.** McElhenney had also been notified that he was turning out bad quality work, on January 16, 1979; this notice was not considered a reprimand.

pline, coupled with previous treatment of employee, indicated that discipline "was pretextual in nature and that the charge . . . was only a mask for a discriminatory motive").

Similar factual conclusions as to an improper motive for McElhenney's second "loafing" reprimand of January 25th are reasonably supported by the record. There was testimony that, on January 24th, during lunch period in the employees' lounge, McElhenney informed the in-plant organizing committee that the Board's Regional Director had recommended that a hearing be held on the union's election objections. This statement was made within hearing range of several company supervisors, including foreman Gray. The following day, Gray and Plant Superintendent Clayton issued McElhenney a written reprimand for loafing, allegedly on the basis that he had impermissibly taken time off from work, en route to and from the restroom, to roast some peanuts and to talk to other employees. There was conflicting testimony as to the length of the restroom trip, and whether and to what extent the "peanut incident" delayed his journey. Foreman Gray admitted that McElhenney had not spent an "inordinate amount of time" in the men's room and that he had not attempted to discern the subject of any of McElhenney's conversations before issuing the reprimand.

We find that the Board's determination of the pretextual nature of this second reprimand for loafing was supported by substantial evidence in the record. While the record does permit a competing, perhaps even equal, inference of a legitimate basis for discipline, the Board could reasonably infer an improper motivation given the timing of the discipline and the circumstances of the employer's antiunion campaign. *See, e.g., Central Freight Lines, Inc. v. NLRB,* 666 F.2d 238, 241 (5th Cir.1982); *Merchants Truck Line, Inc. v. NLRB, supra.*

Finally, and most vigorously contested, were the circumstances surrounding McElhenney's March 1 reprimand for "dishonesty" in counting his production for February 28. An employee's production affects his pay. There was considerable testimony that McElhenney and foreman Gray habitually arrived at the count of pieces finished at the end of each day by subtracting the pieces left *unfinished* at the end of the day from the number of pieces supplied at the beginning of the day. According to testimony, this method was selected, rather than that of counting those finished, since the latter method did not account for the finished pieces that were sent back for further repairs to remedy perceived errors or omissions of other employees at prior production stages. There is no dispute that McElhenney could properly include these items as his daily production even though they had to be sent back for repair through no fault of his own. On the day in question, foreman Gray selected the different and not normally used method of counting the items finished in checking McElhenney's production. McElhenney utilized the normal method. There was a large disparity between McElhenney's and his foreman's count; McElhenney reported his count as ninety cushions while foreman Gray counted only fifty-seven completed cushions. No reason for the foreman's departure from former practice was established in the record. This disparity in count was the basis for the "dishonesty" reprimand.

We recognize that it is questionable as to whether this rather large disparity in count—ninety versus fifty-seven—was in fact attributable to the divergent counting methods selected, particularly in light of the testimony in the record that the company knew, and was concerned, that employees were improperly counting their daily production.[44] The Board, nevertheless, con-

---

44. The "dishonesty" problem at Brookwood, and for which McElhenney was purportedly reprimanded, was that of shifting, rather than fabricating, credit for work. Specifically, employees would collect a "ticket" from each piece of finished work as proof of the amount of work claimed. Each day's tickets were supposed to be turned in for credit for that day's work. Supposedly, employees disregarded this requirement and "held back" tickets and turned them in on other days. This prohibited practice was said to take place because, given

cluded that the disparity must be considered attributable to the divergent methods selected. It found persuasive the circumstance that Gray could not offer an explanation for his selection of the unusual counting method; he did not deny that the disparity in count could, conceivably, have reflected the number of cushions sent back for repair; and he failed to investigate the disparity, including the number of cushions which were actually sent back for repair, prior to issuing the "dishonesty" reprimand. The Board then concluded that the "dishonesty" reprimand was pretextual, masking antiunion motivation. We find that the record reasonably supports this conclusion of the Board.[45]

The Board's conclusions that the three reprimands were pretextual and were motivated by antiunion animus were reasonably drawn, particularly in light of the following factors recited in the ALJ's decision: 1) the timing of the reprimands, viewed in the context of McElhenney's employment record; 2) McElhenney's role as one of the most active union advocates among Brookwood's employees; and 3) Brookwood's commission of various other unfair labor practices in violation of Section 8(a)(1) which evidence its antiunion animus, including two instances of coercive actions directed at McElhenney. As in the case of Wray, we find sufficient evidence in the record to support the Board's conclusion, in this case, that the three reprimands were issued in violation of Section 8(a)(3).

### 2. Discharge

■ The Board also concluded that, even absent consideration of the legitimacy of McElhenney's reprimands, McElhenney's discharge for the cited reasons of "poor work quality" and "loafing" was in fact motivated by antiunion animus. Note that the "dishonesty" reprimand was not relied upon as a basis for discharge by Brookwood. Accordingly it was not considered by the Board in assessing whether McElhenney's discharge was a deviation from company policy and motivated by antiunion animus. The Board, in adopting the ALJ's findings, concluded that in discharging McElhenney, as in the case of Wray, Brookwood deviated from the prior policy of discharge only after three "poor quality" reprimands within

the company's pay structure, employees could increase their overall compensation, however improperly, by shifting credit for work completed by claiming previously unclaimed tickets at a later date. That is, employees received a basic wage if their production fell below the established quota. An employee could save tickets from a day in which the quota would not be made, and claim these tickets at a subsequent date when quota was achieved, thus receiving extra productivity pay for above-quota output. Yet this bonus output actually would not have been earned had the employee properly claimed the tickets on the below quota, flat-rate day in which they were actually collected.

McElhenney allegedly engaged in this "shifting" practice—labeled "stealing" and "dishonesty" by Brookwood—which was the cause of the dishonesty reprimand at issue.

**45.** Brookwood also argued that, even if in fact Gray's count was in error, that error was based upon a good faith, albeit mistaken, belief. While the record might plausibly support the inference urged by Brookwood, it supports at least equally the inference drawn by the Board that any "mistake" was attributable to antiunion animus.

We note also that the cases cited by Brookwood to prove error in the Board's conclusions are factually distinguishable. *E.g., Wyman-Gordon Co. v. NLRB,* 654 F.2d 134 (1st Cir. 1981) (extensive investigation established basis for employer's belief that employee had acted dishonestly); *Delco-Remy Division, General Motors Corp. v. NLRB,* 596 F.2d 1295 (5th Cir.1979) (discharge of employee permissible because of repeated demonstration of "overt indifference to the reasonable demands of her employment," including threatening the life of one supervisor and seeking to instigate her paramour to threaten to assault another supervisor); *NLRB v. South Shore Hospital,* 571 F.2d 677 (1st Cir.1978) (discharge not violative because employer did not know of employee's union activities, employee had a poor work record, and employer had a legitimate basis for believing employee violated a work rule); *Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245 (5th Cir.1978) (where there was no proof that employee was discharged because of union activities and proof established the employee was a chronic absentee throughout employment history, Board order of reinstatement was improper). The Board's determination in this case, as in every case, is uniquely rooted in the specific, and multitudinous, facts in the record immediately before it.

three months. The Board further pointed to the fact that McElhenney was discharged on the day after his *first* "poor quality" written reprimand. While the company cited failure to improve on "loafing" as an additional basis for discharge, there was no evidence that this dissimilar infraction had reoccurred at any time after McElhenney's January 25th reprimand. The Board concluded that the motivating force behind the discharge was Brookwood's antiunion animus. We find that conclusion supported by substantial evidence. The appropriate remedy is reinstatement with back pay.

### Asserted Discovery Error

Finally, Brookwood contends that the Board denied it due process of law by revoking its subpoena for prehearing access to any "exculpatory information" contained in the Board's investigative files. This contention is without merit.

■ The Supreme Court in *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978), addressed a similar disclosure claim asserted under the Freedom of Information Act. Based upon the holding in that case, the Board is not required to disclose the statements of witnesses to be called at a hearing. To do so would necessarily interfere with the Board's enforcement proceedings. *See Red Food Stores, Inc. v. NLRB,* 604 F.2d 324 (5th Cir.1979); *Anderson Greenwood & Co. v. NLRB,* 604 F.2d 322 (5th Cir.1979).

■ It is settled that a party to a Board proceeding has no general right of prehearing access to the Board's investigative files. *J.H. Rutter Rex Manufacturing Co. v. NLRB,* 473 F.2d 223, 232–35 (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973). The cases cited by respondent to the contrary are clearly inapplicable to the request at hand. In particular, Brookwood relies upon *Brady v. Maryland,*

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for the proposition that due process is offended if exculpatory material is not produced pursuant to a subpoena duces tecum. This reliance is severely misplaced, as *Brady* involved a criminal prosecution and its disclosure rule does not reasonably extend beyond the peculiar confines of criminal proceedings.

■ We have held in the past that in unusual circumstances, "when good cause is shown to the Board it should permit discovery" in unfair labor practice proceedings. *NLRB v. Rex Disposables, Division of DHJ Industries, Inc.,* 494 F.2d 588, 592 (5th Cir.1974).[46] The immediate case does not present such an unusual instance to justify interference with the Board's investigative process. Rather, we recognize the applicability here of the usual well established rule that the Board may, "in the course of an administrative investigation, take confidential employee affidavits and withhold them from the parties." *NLRB v. Klingler Electric Corp.,* 656 F.2d 76, 81 (5th Cir.1981) (in the context of union election improprieties) (citing *NLRB v. Robbins Tire & Rubber Co., supra,* and *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 34–35 (5th Cir.1969)).

Moreover, in the immediate case, it should be noted that the company fails to make any specific showing that it was prejudiced by the Board's action in the preparation of its case. Finally, we note that the company was supplied copies of all prehearing statements given by witnesses after they testified, as required by the Board's Rules and Regulations, 29 C.F.R. § 102.-118(b). Accordingly, we find that no improper discovery denial occurred in violation of any due process rights to which Brookwood might be entitled.

### In Conclusion

The National Labor Relations Board found that Brookwood committed twelve

---

**46.** The Supreme Court, in *NLRB v. Robbins Tire & Rubber Co., supra,* 437 U.S. at 237 n. 16, 98 S.Ct. at 2324 n. 16, noted that this Circuit's rule, which permits a limited review of Board discovery rulings, is contrary to the rule applied by other circuits that prehearing dis-

covery questions are committed wholly to the Board's discretion pursuant to Section 6 of the NLRA. The Court in *Robbins,* however, found it unnecessary to "intimate [any] view as to the validity of the Fifth Circuit's approach to Board discovery."

unfair labor practices, ten findings of which were appealed, in violation of Section 8(a)(1) of the Act, by threatening its employees because of their union activities and by coercively interrogating its employees concerning their union activities.

Additionally, the Board found that Brookwood committed five unfair labor practices in violation of Section 8(a)(3), as well as Section 8(a)(1), by its antiunion motivated discharges of employees Wray and McElhenney, and by its pretextual, antiunion motivated discipline of McElhenney on three occasions.

We find that these Board conclusions are supported by substantial evidence in the record as a whole. The remedies of reinstatement with back pay of Wray and McElhenney, and the cease and desist order against further violations of Sections 8(a)(1) and 8(a)(3) by the company are proper.

ENFORCEMENT IS GRANTED.