**CENTRE PROPERTY MANAGEMENT, A Partnership, Petitioner Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.**

No. 86–4058.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1987.

Gus A. Fritchie, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, Daniel Lund, New Orleans, La., for Centre Property Management.

Linda Dreeben, Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Sandra Elligers, Washington, D.C., Hugh Frank Malone, Director, Region 15, N.L.R.B., New Orleans, La., for N.L.R.B.

Before POLITZ, RANDALL, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Centre Property Management, petitions to review and set aside an order of the National Labor Relations Board ("Board") finding that Centre Property had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3)[1] by discharging Carl Tanner for his union activities. The order also found Centre Property in violation of section 8(a)(1) of the Act, for unlawfully interrogating employee Gerald Lemoine about his union sympathies. The Board cross-petitions for enforcement of its order.

This case involves a mixed-motive discharge, where the respondent discharged an employee for both permissible and impermissible reasons. The Board held that the respondent had failed to meet its burden of showing that absent anti-union animus, the employee would have been discharged in any event. We hold that The Board's finding is not supported by substantial evidence because it failed to accord proper weight and deference to the credibility findings of the administrative law judge. We do, however, hold that substantial evidence supports the Board's finding that the interrogation of Lemoine was coercive. Enforcement of the Board's order is therefore granted in part and denied in part.

I

Because the Board reversed the administrative law judge (ALJ), on his findings, and because credibility choices are crucial here, it is necessary to set out the relevant testimony in some detail. First we review the testimony of Carl Tanner, the discharged employee, whose version of the crucial events was discredited in favor of the respondent's version. Following an interview by resident apartment manager Liz Claverie, and property manager Linda Jackson, Carl Tanner was hired on February 18, 1981, as a maintenance man by Centre Properties Management which operates a 620–unit apartment complex, Sherwood Acres I and II in Baton Rouge, Louisiana. On February 23, after a confrontation with Claverie and Jackson over an

---

**1.** Section 8(a)(1) of the National Labor Relation Act provides that:

It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7 of this title;

Section 8(a)(3) of the National Labor Relations Act provides in relevant part that:

It shall be an unfair labor practice for an employee—
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

alleged plumbing code violation at the complex and unionization of the employees, Tanner was discharged. Tanner's version of the events is different from that given by Claverie and Jackson.

According to Tanner, when he was first shown around the property, he noticed a number of open and missing sewer plugs, and toilet paper and waste matter on the grounds, but he was told not to replace the plugs. He worked on 18, 19, and 20 February and discussed the formation of a union with Mary Ella Ferguson, a housemaid assigned to the complex, and her brother, Major Schaefer. He reported to work on Monday, 23 February at about 7:40 a.m., and gathered with other employees to drink coffee in the lounge in accordance with the custom. He began to discuss the organization of a union among Centre Property's employees, showed them pamphlets issued by the National Labor Relations Board, and informed them of their rights to organize. Shortly before 8 a.m., Resident Manager Claverie asked what was going on and, according to Tanner, he told her, "Those are the pamphlets of the labor union, for when we form the union," and Claverie then walked into her office.

Tanner put on his tool belt, walked into Claverie's office to pick up his work orders, and told Claverie that replacements were necessary for the missing sewer plugs. He told her that the open sewers were a health hazard and that the City Parish (Baton Rouge) Board of Health could "shut us down" and "have the utilities cut off," adding that he knew this because he was a former plumbing inspector. When Tanner inquired how long it would take for a requisition for the plugs to be issued, Claverie replied that she did not know. Without further instructions, Tanner then left to count the missing plugs.

Property Manager Jackson soon called him to the office where one of the housemaids, Ferguson, a security guard, Paul Frank Maranto, Jr., Claverie, and Candice Berry, Centre Property's leasing agent, had gathered. Jackson told Tanner to close the door and then asked him why he had requested the plugs. When Tanner explained, Jackson said "Oh, well, we'll take care of that." Jackson next asked Tanner whether he belonged to a union and whether he had a union card, and he replied in the affirmative. He went out to his van, brought in the pamphlets, opened them, and told her he had enough membership cards for all of the employees to sign. After that, Jackson became excited and told Tanner that he was fired. She turned to the other employees and told them she would fire anyone who wanted to join the union. According to Tanner, she said that she was not going to have any union men working there, and told him to turn in his keys and get off the property. Jackson gave him his termination slip, and the security guard began pushing Tanner to the door. Tanner then announced that he was going straight to telephone the inspection department to report the missing sewer plugs, which he did. When he read the termination slip, he found that "threatened extortion" had been listed as the reason for his termination. Tanner later called Jackson and asked her what this term meant, and, according to Tanner, she replied, "Well, anytime anybody threatens me with a union for more money, that's threatened extortion."

Mary Ella Ferguson, who was then a housemaid at Sherwood Acres, claimed to have overheard the conversation between Jackson and Tanner and essentially confirmed Tanner's version of the conversation. She also testified that there was "filth and mess" running on the grounds from the sewers in several places. She further testified that she and Tanner did not discuss the sewers. There was no evidence that Tanner had discussed the problems with the sewers with any other employee, nor that other employees had discussed it with Tanner or among themselves. Ferguson was later terminated for absenteeism.

Claverie, the resident apartment manager, testified that when she arrived at work on the morning of 23 February, the employees approached her and told her Tanner

wanted them to sign papers and she inquired whether they had signed anything. They replied that they had not and she said, "Well, good, don't sign anything." At that point, Tanner told her he didn't think the employees made enough money. According to Claverie, she replied "Carl (Tanner), we discussed your salary, and you said everything was fine." Then Tanner told her that he had reported Sherwood Acres to the Baton Rouge City Parish inspectors and that they were scheduled to come out. Tanner also told Claverie that the complex had improper sewer drainage. Claverie recalls having said: "Carl, you're going to get into trouble. Why did you do this? I can't believe you are doing it, you know, why not talk to us about it first, you know?"

Claverie testified further that she called Property Manager Linda Jackson and informed her that Tanner had reported Sherwood Acres to the City Parish and then told Tanner, "Carl, you're going to lose your job." She said that when she told Tanner he would lose his job, she was referring to Tanner's "disrupting the employees and also upsetting us by calling the outside men, the City Parish, on us." Claverie testified that when Jackson arrived she called an attorney and informed him that Tanner had reported Centre Property "to the city inspectors, and he's also here with a petition without—you know, asking prior warning." Jackson asked the attorney how she could terminate Tanner. After receiving his advice, Jackson directed her to prepare a termination form for Tanner, summoned Tanner and terminated him.

Claverie further testified that at the time of her initial conversation with Tanner, he spoke in a "strict" manner "like his mind was already made up."

Next we have the version of Linda Jackson, the property manager whose testimony was credited by the ALJ. Jackson testified that when she went to the office after receiving Claverie's telephone call concerning Tanner, she told the employees to go to work but that Tanner refused. He told her he was waiting for the city inspectors to arrive. When she asked Tanner, "What do you feel is wrong?" he replied that Centre Property was in violation of city codes and mentioned drainage, the sewer and electrical problems. Tanner repeated he was not going to work but was waiting for the city inspector to arrive; he told her the employees were underpaid and that "I do intend to unionize you." She testified that she decided to terminate Tanner for his refusal to go to work, his issuance of threats concerning the inspections and his manner in doing so, "screaming stuff at me about violations and city codes," and telling her to "speak pretty" and "I have you on tape." She left and telephoned Centre Property's attorney who advised her to discharge Tanner for "threatened extortion" on the basis of his "threatening accusations." She then returned and discharged Tanner for "threatened extortion."

Candace Berry, a leasing agent for Sherwood Arms at the time, was present when Tanner was fired and confirmed the accounts given by Jackson and Claverie. Other Centre Property employees who were present at the firing, painter Gerard Lemoine and security guard Paul Maranto, testified and corroborated Jackson's account.

Immediately after Tanner's dismissal Jackson asked employee Lemoine whether he had signed the petition. Lemoine, treating the question as a joke, replied in the affirmative, although he had not signed the petition. In response, Jackson, treating Lemoine's reply lightly, said "You better not have signed it."

## II

The ALJ credited the accounts of Tanner's firing given by Claverie, Jackson, and Berry above the accounts given by Tanner and Ferguson. In his initial decision, however, the ALJ, relying on *Alleluia Cushion Co., Inc.*, 221 NLRB 999 (1975), found that Tanner's action of reporting safety violations on his own to the local authorities constituted protected, concerted activity, and that Tanner's discharge, in part for reporting the company, and in part for his

protected union activities, violated sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act. The ALJ also found that the interrogation of Lemoine violated section 8(a)(1) of the Act. Sometime after the ALJ's decision, the Board overruled *Alleluia Cushion* in *Meyers Industries*, 268 N.L.R.B. 493 (1984), remanded *sub nom Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.1985). The Board therefore, remanded the case for the ALJ to reconsider in the light of *Meyers* and to apply the Board's test for analyzing a mixed-motive discrimination case, if applicable. *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enf'd on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

In his supplemental decision, the ALJ did not alter his earlier credibility findings. He did, however, determine that Tanner's conduct was not concerted within the meaning of the Act and, accordingly, the company did not violate section 8(a)(1) of the Act insofar as it relied on this conduct in discharging Tanner. The ALJ therefore applied the *Wright Line* analysis. Because he found that the company would have discharged Tanner even absent his union activity, the ALJ concluded that Centre Property did not violate either section 8(a)(1) or section 8(a)(3) of the Act by dismissing Tanner. The ALJ also reaffirmed his prior finding that the interrogation of Lemoine violated section 8(a)(1) of the Act, analyzing his decision in the light of the Board's new totality of the circumstances rule set out in *Rossmore House*, 269 N.L.R.B. 198 (1984). While the Board adopted the ALJ's finding regarding Lemoine's interrogation, it disagreed with the ALJ's conclusion regarding Tanner's discharge and found that the respondent company did not show that Tanner would have been discharged absent union activity. It therefore concluded that Centre Property had violated sections 8(a)(1) and 8(a)(3) of the Act by firing Tanner.

## III

■ In reviewing decisions by the Board, we determine, on the basis of the record taken as a whole, whether or not substantial evidence supports the Board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), *NLRB v. Welfed Catfish, Inc.* 674 F.2d 1076, 1078 (5th Cir.1982). In determining whether the Board's decision is supported by substantial evidence, we must also consider that evidence which fairly detracts from the Board's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 465; *NLRB v. ESCO Elevators, Inc.*, 736 F.2d 295, 298 (5th Cir. 1984).

■ In this case, the Board concluded that Centre Property had failed to establish, by a preponderance of the evidence, that it would have discharged Tanner in the absence of his union activity. When the Board's findings conflict with the ALJ's, the records, including the ALJ's report, must be subjected to particular scrutiny. *Universal Camera Corp. v. NLRB*, 340 U.S. at 496, 71 S.Ct. at 468–69; *Central Freight Lines, Inc. v. NLRB*, 653 F.2d 1023, 1027 (5th Cir.1981). Such scrutiny is more searching than it is when the Board and the ALJ are in agreement. *Berry Schools v. NLRB*, 653 F.2d 966, 969 (5th Cir.1981), *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir.1980), *Syncro Corp. v. NLRB*, 597 F.2d 922, 924–25 (5th Cir.1979).

Careful examination of the record is all the more called for when resolution of the case depends on witness credibility. And in such cases special deference must be paid to the ALJ's conclusion. *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 407, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962), *Universal Camera Corp. v. NLRB*, 340 U.S. at 496, 71 S.Ct. at 468–69; *NLRB v. Southern Plasma Corp.*, 626 F.2d 1287, 1293 (5th Cir.1980). Reviewers of an ALJ's credibility findings may displace such findings only in the most unusual of circumstances. *NLRB v. Jacob E. Decker and Sons*, 569

F.2d 357, 364 (5th Cir.1978). As the Supreme Court in *Walton Mfg.* put it: "But the Examiner ... sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." *NLRB v. Walton Mfg. Co.*, 369 U.S. at 408, 82 S.Ct. at 855. With these considerations in mind, our examination of the record persuades us that the Board erred in reversing the ALJ's finding, and that substantial evidence does not support the Board's finding that Carl Tanner would not have been discharged absent for his union activities. The ALJ resolved the case primarily on credibility findings. Carl Tanner presented one account of the circumstances surrounding his terminations, and this was corroborated by Mary Ella Ferguson. Linda Jackson, the property manager, gave a sharply different account of the same facts. Her account was corroborated by other present and former Centre Property employees: Liz Claverie, Candace Berry, Paul Maranto, and Gerard Lemoine. The ALJ chose to believe Jackson's account rather than Tanner's account. And while the ALJ found that the general counsel had made out a prima facie case that Tanner's union activities were a motivating factor in the decision to discharge him, in applying the *Wright Line*[2] analysis, the ALJ concluded that Centre Property had a reasonable basis for discharging Tanner for actions in reporting code violations to governmental authorities, and would have discharged Tanner even in the absence of his union activities. The Board came to a different conclusion, however, because it could find no direct evidence that Tanner would have been discharged for his unprotected activities alone.

■ We believe that the Board's position is premised on an overly restrictive view of the kind of evidence that will satisfy the employer's burden in dual motivation cases. Nothing in the Board's *Wright Line* decision indicates that the employer's burden

cannot be met by using circumstantial, as opposed to direct, evidence. Nor does the Board cite any authority supporting its position that the employer's *Wright Line* burden must be met through the use of direct evidence. As the record shows, there is more than ample circumstantial evidence that Centre Property would have discharged Carl Tanner absent his union activities.

■ Given the ALJ's credibility assessments, which the Board's decision did not dispute, our review of the record convinces us that all affirmative evidence shows that Tanner would have been discharged for reporting code violations even in the absence of anti-union animus. We therefore conclude that substantial evidence does not support the Board's finding to the contrary. It is especially clear to us that substantial evidence does not support the Board's conclusion when we consider the evidence that detracts from the Board's conclusion.

Jackson's testimony regarding Tanner's firing reveals that she was upset by Tanner's reporting alleged code violations without prior notice. Of equal significance is her testimony that she was upset by Tanner's threatening manner. At numerous junctures in her testimony, Jackson pointed out that she felt threatened by Tanner. When Tanner discussed the violation with her, Jackson noted, "He was using a tone of voice and threatening accusations toward me: 'If you don't do this, and you don't do that,' you know, and 'I'm not going to work.'" Jackson testified that she felt that Tanner's accusations were themselves threatening in nature: "And I felt threatened, the fact, you know, here this guy—this man that's hired went above my head." In discussing why she dismissed him for "extortion," Jackson explained: "You know, I know what extortion is—threatening? Yes, he was threatening.

---

**2.** *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir.1981), *cert. den.*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), *approved* in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), sets out the framework for analyzing "mixed motive cases," where an employer action is based on both proper and improper motivations.

He made threatening accusations to me, and that's why he was terminated." ·Jackson also noted that she was put off by Tanner's disrespectful behavior: "I really felt threatened by the man; and I felt very, kind of, well, non-respected for sure." Jackson's account of Tanner's disrespectful and threatening manner is corroborated by the testimony of her co-workers Liz Claverie and Candace Berry. Liz Claverie testified that she and Jackson were upset by Tanner's threatening manner. Candace Berry also noted that Tanner was very rude to Jackson:

> I can't say what's the purpose of the threat was. The only thing that I, you know, had I approached my employer in that manner, with the type—the tone of my voice, you know, that he used—I think I would have expected to be terminated, you know, at that time.... He didn't care any longer that she was his employer, and coming across to her in a, you know, a threatening manner.

The timing of Jackson's decision to terminate Tanner is significant. Jackson testified that Tanner did not inform her that he planned to unionize the employees until just before Jackson called Centre Property's attorney. By then, Jackson testified that she was already upset with Tanner, and had decided to terminate him. According to Jackson, when Liz Claverie first brought the problem with Tanner to her attention, Claverie mentioned something about a "petition," but did not know that it was union related. Jackson testified that at the time she was not knowledgeable about union matters. Jackson's phone discussion with the attorney is important because the attorney recommended grounds for firing Tanner, and Tanner was subsequently discharged. Although Jackson discussed both Tanner's reporting of the code violations and his union activities, her conversation was principally centered on the former. Her credited testimony shows that she brought up the issue of code violations first, after which the attorney told her: "But the man sounds like you don't need him working for you."[3] This was before she made any mention of union organizing to the attorney. Her mention of Tanner's desire to unionize was brief, with the attorney telling her that she needn't worry about that. Jackson complained to the attorney about Tanner's threatening behavior, and he. suggested that she discharge Tanner on grounds of threatened extortion. The rest of Tanner's discussion with Jackson about unionizing occurred, according to her credited testimony, *after* Jackson's conversation with the attorney. On our examination of the record, therefore, we do not find substantial evidence to support the Board's finding.

## IV

The Board found that Jackson's interrogation of Gerard Lemoine was a violation of section 8(a)(1). We hold that although the issue is a close one because it appears that neither of the participants regarded the question as threatening or coercive, substantial evidence can be found to support the Board's holding.

The established position of both the Board and this court is that questioning an employee about union sympathies is not per se unlawful; rather, the rule is that an employee interrogation is unlawful only where under the totality of circumstances the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act. *Hotel Employees & Restaurant Employees Union v. NLRB*, 760 F.2d 1006 (9th Cir.1985) *affirming Rossmore House*, 269 N.L.R.B. 198 (1984), *NLRB v. Great Western Coca-Cola Bottling Co.*, 740 F.2d 398, 404 (5th Cir.1984).[4]

---

3. We regard this exchange, taken in the context of the rest of Jackson's credited testimony, as strong evidence that Tanner would have been discharged regardless of his union activities. It clearly suggests that Centre Property's attorney would have recommended Tanner's discharge solely on grounds relating to his behavior in reporting code violations.

4. In the past, this court has set out a series of factors to be taken into consideration in analyzing employee interrogation cases: (1) the histo-

■ The Board adopted the ALJ's finding that Jackson's interrogation of Lemoine was inherently coercive. The ALJ premised his conclusion on the fact that the message was delivered just after Tanner's discharge in part for union activities. The ALJ also found that, notwithstanding the joking manner in which it was delivered, the message in the interrogation was clear: Centre Property would tolerate no union organizing.

Centre Property, on the other hand, points out that both Lemoine and Jackson treated her question and response in a joking manner. There is no question but that this point is relevant; indeed, it was considered by the ALJ. This circumstance is not necessarily dispositive, however. The test applied to employee questioning is not whether the employee is actually coerced, but whether the questioning tends to be coercive. *NLRB v. Great Western Coca-Cola Bottling Co.*, 740 F.2d at 404; *Cagle's, Inc. v. NLRB*, 588 F.2d 943, 948 (5th Cir.1979); *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898, 909 (5th Cir.1978).

Viewing the record as a whole, we conclude, though not without some hanging doubts, that substantial evidence supports the holding of the ALJ and the Board that the question at issue here violated section 8(a)(1). As we have said earlier in this opinion, we accord great deference to the factual findings of the ALJ who is in a better position than this court to assess the credibility and weight of the evidence before him. Given the fact that the questioning took place just after Tanner had been discharged in part for his protected activities, and given the fact that the ALJ found the content of Jackson's remarks to be hostile toward unionization, we grant en-

forcement to that part of the Board's order based on Jackson's questioning of Lemoine.

V

For the reasons we have stated, we hold that substantial evidence does not support the Board's finding that Centre Property's discharge of Carl Tanner violates sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. We do, however, hold that the Board's finding that the questioning of the respondent's employee Lemoine violated section 8(a)(1) is supported by substantial evidence. Thus, in sum, we deny enforcement of the Board's order with respect to the discharge of Tanner, but grant enforcement of the Board's order with respect to the interrogation of Lemoine.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.

ry of the employer's attitude toward its employees; (2) the nature of the information sought; (3) the rank of the questioner in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer as-

sured the employee that no reprisals would be forthcoming should he or she support the union. *Lord & Taylor v. NLRB*, 703 F.2d 163, 166 (5th Cir.1983), *NLRB v. Brookwood Furniture, Div. of U.S. Ind.*, 701 F.2d 452, 460–61 (5th Cir.1983); *Delco-Remy Division, General Motors Corp. v. NLRB*, 596 F.2d 1295, 1309 (5th Cir. 1979). However, the list is neither definitive nor determinative. *NLRB v. Brookwood Furniture, Div. of U.S. Ind*, 701 F.2d at 461.