NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SEA–LAND SERVICE, INC., (Sea Operations), Respondent.

No. 86–4653.

United States Court of Appeals,
Fifth Circuit.

Feb. 26, 1988.

Linda Dreeben, Atty., Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Victoria A. Higman, Washington, D.C., for petitioner.

Robert J. Attaway, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, Ann E. Isaac, Sea-Land Corp., Edison, N.J., for respondent.

Before BROWN, REAVLEY, and JOLLY, Circuit Judges.

**JOHN R. BROWN,** Circuit Judge:

The Board, over the dissent of Chairman Dotson, overruling the decision of the ALJ, held Sea-Land guilty of violating § 8(a)(1)[1] by coercively interrogating the Radio Operator Dunleavy and in discharging Dunleavy under § 8(a)(4)[2] because of the acknowledged, undisputed, uncontradicted refusal of Dunleavy to answer questions put to him by the Master of an oceangoing vessel while at sea.[3] What distinguishes this from the ordinary run of the mill everyday garden variety land based situation in which decision would hardly merit an unpublished opinion, the significant problem here is how far and to what extent the National Labor Relations Act goes to sea. Of course it does, *Southern Steamship v. NLRB,* 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942), but its application, with orders and sanctions issued under it, are trimmed to the traditions of the sea as reflected by the intricate web of congressional actions.

The scene is laid, not in some suburban shopping center, a nearby foundry or textile mill. Rather, all that occurred took place on the S/S SAN PEDRO, an oceangoing, cargo carrying vessel operating in and out of the Port of New Orleans. On 23 February 1984, shortly after the ship docked at New Orleans, Captain Gary Fleeger, the ship's Master, in contact with the company's local office, was asked by Captain Savage, the senior port captain, about any problems the ship was having with the NLRB and why the ship was calling them. Mystified by the inquiry, Captain Fleeger responded in complete ignorance. He learned subsequently that a radio message from the ship inquired about the telephone number of the National Labor Relations Board.

### Sparks Fly

Concerned that this unauthorized radio transmission was in direct violation of established practices and his plain verbal instructions and in excess of the authority of the radio officer and suspecting something was wrong, not only in Denmark but on the SAN PEDRO, Captain Fleeger, at about 1700 hours on the same day, while the ship was still in the port, posted a note on the door to Dunleavy's cabin aboard the ship.[4] The message stated, in so many words, that the Captain had learned that on 21 February, Dunleavy had used the ship's radio to contact the National Labor Relations Board. Specifically, the Captain demanded by 0800 hours, 24 February 1984, a detailed written explanation as to:[5]

[1] What prompted the call to the National Labor Relations Board ...;

[2] By what authority [Dunleavy] made the requests of service from Sea-Land in New Orleans to find the number for [him] when they assume that *ALL* requests for action are made in my name, and

[3] by what authority [Dunleavy] actually placed the call on the ship's system.

It is uncontradicted that Dunleavy saw the memorandum at around 2130 hours. At 0030 hours, February 24, the SAN PEDRO departed New Orleans. While underweigh at sea Captain Fleeger received this answer from Dunleavy.

I have insufficient knowledge or evidence of the accusations leveled against me in your letter of 23 February 1984. It would be extremely difficult and well nigh impossible to answer certain items of which no knowledge exists. However, the accusations are serious and any further proof of same would be appreciated.[6]

After receiving this response, Captain Fleeger took a copy of his first February

---

**1.** 29 U.S.C. § 158(a)(1), (National Labor Relations Act).

**2.** 29 U.S.C. § 158(a)(4).

**3.** 280 NLRB No. 84.

**4.** TR p. 33. "TR" refers to the transcript of the unfair labor practice hearing before the administrative law judge.

**5.** For ease in identification, the inquiries in the February 23 and February 24 communications are bracketed sequentially.

**6.** GCX 7. "GCX" refers to the exhibits introduced by the General Counsel at the unfair labor practice hearing before the ALJ.

23 memorandum, and added to it the following:

Regarding your answer to the above letter, I find it rather difficult to understand your reply.

These are not "trick" questions. I will try to simplify them even further.[7]

[4] Did you or did you not contact Sea-Land New Orleans and request the location and/or the telephone number of the National Labor Relations Board?

[5] If you did do the above, by what authority did you initiate the query?

[6] Did you, or did you not actually call the NLRB? If so, did you use the ship's communication equipment?

[7] What prompted your inquiry regarding the NLRB? (assuming that you did ask Sea-Land for the address and/or telephone number?)

[8] If you did not make any inquiry to Sea-Land regarding the NLRB, did anyone else do so to your knowledge?

With no response to any one or all of his questions, the Master received finally this terse reply at 1600 hours, February 25:

This letter will serve as a final reply to both letters mentioned above. On February 23, 1984, you falsely and irresponsibly accused me, *in writing*, of illegal use of the ship's radio station and/or communications equipment ...

This answer, as given above, to your letters and/or accusation is: firm, final, and due no further consideration on my part at this point in time. Any further comments re the above will be made through my union and/or an attorney....[8]

Shortly thereafter, Captain Fleeger instructed Dunleavy to send a message to Sea-Land's New Orleans office requesting a replacement radio officer to meet the ship at San Juan, Puerto Rico.

*Two Years Before the Mast*

On 26 February, still at sea at 1600 hours, Captain Fleeger invoked a disciplinary meeting described by all those who go down to the sea in ships as a logging.[9] Captain Fleeger meticulously complied with the requirements,[10] including the entries in the official log.[11]

7. *See* n. 3, *supra*.

8. GCX 8.

9. As mandatory as the National Labor Relations Act and as hoary with age since its enactment in 1898, 46 U.S.C. § 701 giving an American shipmaster the power to impose punishment for sea-going offenses provides:

Whenever any seaman who ... commits any of the following offenses, he shall be punished as follows:

\* \* \* \* \* \*

Fourth. For willful disobedience to any lawful command at sea, by being, at the option of the master, placed in irons until such disobedience shall cease, and upon arrival in port by forfeiture from his wages of not more than four days' pay, or, at the discretion of the court, by imprisonment for not more than one month.

Fifth. For continued willful disobedience to lawful command or continued willful neglect of duty at sea, by being, at the option of the master, placed in irons, on bread and water, with full rations every fifth day, until such disobedience shall cease, and upon arrival in port by forfeiture, for every twenty-four hours' continuance of such disobedience or neglect, of a sum of not more than twelve days' pay, or by imprisonment for not more

than three months, at the discretion of the court.

R.S. § 4596; December 21, 1898, c. 28, § 19, 30 Stat. 760. This goes back to June 7, 1872, c. 322, § 51, 17 Stat. 273.

10. Section 46 U.S.C. 701 as read by Captain Fleeger actually had been repealed six months earlier on August 26, 1983, but was reenacted as 46 U.S.C. § 11501. The power of the master to impose sanctions was not altered. The punishment for willful disobedience to a lawful command at sea was changed to confinement until the disobedience ends and the forfeiture of not more than 4 days' pay. For "continued willful disobedience ... the seaman ... may be confined, on water and 1,000 calories, with full rations every 5th day until the disobedience ends," in lieu of bread and water.

11. At the time of this incident, Captain Fleeger's version of Title 46 required .in § 703 that an entry be made in the official log book (from whence the term "logging") which shall be signed by the master and the mate or one of the crew and the offender. The offender shall be furnished a copy of the log entry and together with such reply as the offender may see fit to afford. This had been repealed in 1983 (*see* n. 10, *supra* ), and reenacted as § 11301(b)(2).

Present at this proceeding were Captain Fleeger, Dunleavy, the chief officer, and the chief engineer. Captain Fleeger, reading a prepared statement, stated that he had been trying, without success, to have Dunleavy answer questions pertaining to the operation of the ship's radio. He advised Dunleavy that he had not yet been discharged and that the request for a replacement radio officer could be cancelled. Fleeger also read portions of 46 U.S.C. 701 [12] prescribing that "a seaman guilty of willful disobedience to any lawful command at sea [may be] placed in irons" and if guilty of "continued willful disobedience to lawful command ... [may be] placed in irons, on bread and water."

At the conclusion of Captain Fleeger's reading of his prepared statement, Dunleavy said he would like to make a statement which he personally then wrote in the official log book stating "I wish to make no further statements regarding the operation of the ship's radio station on the grounds that by doing so I may incriminate myself." [13]

Several things are without any possible basis of contradiction. First, and of perva-

sive significance, is the fact that the transmission of the message inquiring as to the telephone number of the Labor Board was in flat violation of the master's lawful orders. Captain Fleeger had ordered that except for "hearts and flowers" personal messages sent for crew members, no, and in the tradition of radio messages, repeat no, message was to be sent without the express authority of the master.[14]

Equally decisive, this flat prohibitory order was not out of petty pride of the master to demonstrate his powers or to exhalt his high office. It was brought about strictly by the laws' demand that a "mobile radio station is placed under the supreme authority of the master ... of the ship ... carrying the mobile station." [15] These binding regulations also demand that the master "shall require that each operator comply" with the regulations and that the ... station for which the operator [16] is responsible is used, at all times, in accordance with these Regulations.[17]

Again, this is in no way merely to enhance the position of the master. Rather, it is to assure that the order of priority of communications prescribed by § 83.176 [18]

12. *See* n. 9, *supra.*

13. Tr. 98, RX 12. "RX" refers to exhibits introduced by Sea-Land at the unfair labor practice hearing.

14. ALJ op. p. 1.

15. 47 U.S.C. § 358 explicitly provides:
The radio installation, the operators, the regulation of their watches, the transmission and receipt of messages, and the radio service of the ship except as they may be regulated by law or international agreement, or by rules and regulations made in pursuance thereof, shall in the case of a ship of the United States be under the supreme control of the master.
47 C.F.R. § 83.173 (1985) provides, that except as altered by prescribed regulations or international agreements,
the service of each station on board ship shall at all times be under the supreme control of the master, who shall require that each operator of such station comply with the International Radio Regulations in force and that the ship station for which the operator is responsible is used, at all times, in accordance with those regulations.

16. *See also* Chapter XI, article 45, Radio Regulations, (published by the General Secretariat of

the International Telecommunications Union) (Geneva, 1976). The Final Acts of the World Administrative Radio Conference for Maritime Radiocommunications (Geneva, 1974), signed on 8 June 1974, include the following provisions:
The revised provisions of the Radio Regulations shall form an integral part of the Radio Regulations which are annexed to the International Telecommunications Convention. They shall come into force on 1 January 1976, upon which date the provisions of the Radio Regulations which are cancelled or modified by this provision shall be abrogated.
*See also* 46 U.S.C. § 7103(a) which provides
A license as radio officer may be issued only to an applicant who has a first-class ... radiotelegraph operator license issued by the Federal Communications Commission.

17. 47 C.F.R. § 83.171 provides that "the use and operation ... shall be governed by applicable provisions of the international Radio Regulations and ... all other International agreements in force to which the United States is a party.

18. 47 C.F.R. § 83.176 provides:
Ship stations ... shall observe *at all times* the priority of communication sets forth in § 83.177; in particular ... shall give *absolute*

and § 83.177 [19] are complied with. A radio operator theoretically has to be continuously on watch and not have any traffic from the ship interfere with his capacity to receive priority messages.

There are also numerous statutory commands concerning ship's radios and radio operators. 47 U.S.C. § 351 provides that for a cargo ship in excess of 300 gross ton, it is a violation to leave a harbor for a voyage on the open sea unless the ship is equipped with a radio station and operated by a radio officer. Section 353(a) provides for two radio officers. Under § 353(b) a ship provided with auto alarm may have one radio operator. Section 353(c) requires "a watch of at least eight hours per day, in the aggregate, shall be maintained by a means of a qualified operator."

### Who's in Command?

With this almost certain violation of his standing order, what was the master to do in exerting his "supreme command"? Although there could be little doubt in the master's mind whether the act had been done,[20] the minimum for the master to do was to ascertain whether the unauthorized message had actually been sent.

At least questions [5], [6], and [8] addressed this issue precisely. (See also [2], [3] and [4]). More than that, the master, conscious of (i) his responsibility for maintenance of discipline aboard ship, (ii) the fact that Dunleavy had not answered as ordered the initial inquiry of 23 February and (iii) appropriate punishment could be imposed by the master at the logging under 46 U.S.C. § 11501,[21] was entitled to know the circumstances under which the unauthorized message was transmitted. This would include, both in mitigation and explanation, the reasons why the act was done.

Considering the refusal of Dunleavy to offer any explanation for his acts and the inability of the master to predict or anticipate how such transgressions of the Radio Operator would affect or frustrate the mandatory priorities of radio communications,[22] the reasons why the act was done

*priority* to radio communications or signals ... relating to any ship or aircraft in distress.... (Emphasis added).

**19.** 46 C.F.R. § 83.177
(a) The order of priority ... shall be as follows:
(1) Distress calls ...
(2) Communications preceded by the international ... urgency signal.
(3) Communications preceded by ... international safety signal.
(4) Communications relative to radio direction-finding bearings
(5) Communications relative to the navigation and safe movement of aircraft.
(6) Communications relative to the navigation ... of ships; including weather observation messages ...
(7) Government communications for which priority right has been claimed.
(8) Service communications relating to the working of the ... service....
(9) All other communications.

**20.** The message transcribed in the Shipowner's New Orleans office reflected Dunleavy, not the Master, as the originator. TR. pp. 30–31, 495. The captain made a note of this in the ship's log. TR. p. 35.

**21.** Section 11501.

When a seaman lawfully engaged commits any of the following offenses, the seaman shall be punished as specified:
(4) For willful disobedience to a lawful command at sea, the seaman, at the discretion of the master, may be confined until the disobedience ends, and on arrival in port forfeit from the seaman's wages not more than 4 days' pay or, at the discretion of the court, may be imprisoned for not more than one month.
(5) For continued willful disobedience to lawful command or continued willful neglect of duty sea, the seaman, at the *discretion* of the master, may be confined, on water and 1,000 calories, with full rations every 5th day, until the disobedience ends, and on arrival in port forfeits, for each 24 hours' continuance of the disobedience or neglect, not more than 12 days' pay or, at the discretion of the court, may be imprisoned for not more than 3 months.
Former § 701 described punishment for willful disobedience "at the option of the master, the seaman be "placed in irons, on bread and water, with full rations every 5th day."
Presumably from the leniency of 1983, the Congress substituted "confinement" for "placed in irons" and "1,000 calories" for "bread and water."

**22.** *See* n. 18, *supra.*

bore directly on the master's statutory discretion in meting out punishment.

Conceding that in a land-based plant, a warehouse in the middle of an arid state, a highly sophisticated laboratory located on a university campus, the question seeking what "prompted" [23] Dunleavy to contact the Labor Board could justifiably give rise to a holding that this interfered with or discouraged his access to the Board in violation of § 8(a)(1), the result is different here. In the first place, the ALJ categorically found that "no violation took place here." [24] The ALJ was on sound ground for, although the case is obviously one in which a reviewing court could rely primarily on the ALJ's contrary finding, we conclude the difference between the ALJ and the Board on the significance of the maritime setting is the principal question to be addressed here.

As Judge Jolly has recently stated for us, "[t]he established position of both the Board and this court is that questioning an employee about union sympathies is not per se unlawful; rather, the rule is that an employee interrogation is unlawful only where under the totality of circumstances [25] the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act." *Centre Property Management v. NLRB*, 807 F.2d 1264, 1270 (5th Cir.1987)

The ALJ made elaborately detailed findings on the relative credibility of Captain Fleeger and Dunleavy, including "their testimonial demeanor as well as the inherent reliability of their conflicting versions." The ALJ summed it up: "Not only do I conclude that Dunleavy's disputed evidence lacks plausibility ... but I also find that generally Fleeger was a consistent and straightforward witness." In contrast to this, the ALJ went on, "Dunleavy was hesitant, evasive and not as forthright, and his testimony exhibits internal inconsistencies." [26]

■ This finding is crucial to the Board's application of *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1982), upholding the Board's *Wright Line*, [27] rule. That rule provides that even though the Board determines that the employee's protected conduct was a substantial factor in the employer's adverse action, the employer may nevertheless avoid Board sanctions by establishing, by a preponderance of the evidence, that the "discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event," regardless of the employer's forbidden motivation. 462 U.S. at 400, 103 S.Ct. at 2473. Under *Transportation Management*, it is only fair that the employer "bear the risk that the influence of legal and illegal motives cannot be separated...." 462 U.S. at 403, 103 S.Ct. at 2475. What sets in train the problem of mixed motivations is the need for the Board's dual determination that the employer's adverse action was (i) an interference by the employer in the employee's protected conduct and (ii) a result of the protected conduct. If Question [7], as propounded by the Master to Dunleavy, does not restrain or interfere with Dunleavy's exercise of rights guaranteed by the Act, the employer has no burden to demonstrate the distinction between legal or illegal, permissible or impermissible, actions.

It is significant that the Board in reaching a conclusion contrary to that of the ALJ, did not do so on the basis of a contrary, factual assessment. Rather, the Board emphasized that the ALJ, "relying on Southern Steamship Co. v. NLRB found that the interrogations in neither memoranda violated the Act because of the special

---

**23.** *See* Question [7], *supra*, 837 F.2d at 1390.

**24.** ALJ op. p. 10.

**25.** *See* especially 807 F.2d at 1270 n. 4, listing the eight factors, described as the "Bourne" test by Judge Jones' opinion for us in *Fiberglass Systems, Inc. v. NLRB*, 807 F.2d 461, 463 (5th Cir.1987).

**26.** ALJ op. 4–5.

**27.** *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced* 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

maritime setting of this case." (Citations omitted).[28] Describing the ALJ's decision, the Board went on, "noting Fleeger's testimony, [the ALJ] concluded that Dunleavy was discharged for refusing to obey Fleeger's lawful command to answer questions regarding the use of the ship's radio equipment, [presumably Questions [2] and [3]], not for refusing to answer an unlawful interrogation," [presumably [7]].[29]

The Board then made plain that "contrary to the [ALJ], we do not believe that the special maritime setting of this case renders inapplicable a traditional labor law analysis." [30] We disagree. It is the maritime setting which on this record deprives the Board's finding of acceptable support. Question [7] was not propounded to discourage Dunleavy's protected rights. It was the product of the determination that Captain Fleeger's commands had been flagrantly violated and to assure continued discipline on the vessel. At sea the Master needed to know the relevant facts and then determine appropriate punishment for the transgressions.

The record, in the light of widespread congressional regulations of ships, and seamen, compels the conclusion that despite the presence (or unique status) of Question [7], Dunleavy would have been discharged for refusal to answer the benign questions.

### The Nation's Concern with Ships/Seamen

The Congress, from its second session, was deeply concerned with the merchant marine of this very new republic. It recognized that without ships and ship operators —interests which needed protection—the young republic could neither grow nor thrive. But more so, the Congress was aware that, no matter how many, or how seaworthy, bottoms were available or current venturers to operate them, the merchant marine could not succeed without persons to man and navigate the vessels. Seamen, and their welfare, were a predominant interest of the Congress then, and history reflects, still are.

This started with the Act of July 20, 1790, 2d Sess., 1 Stat. 131. It provided, as a forerunner to later formalized shipping articles that beginning December 1, 1790 for oceangoing vessels that there be written employment agreements declaring the voyages in terms for which seamen shall be shipped. If, on the day of shipment, the seaman failed to be present, the Master, on the day on which such neglect happened, was to make an entry in the log-book of the vessel. The seaman would face a penalty of one day's pay for each hour of absence. If absence continued and the ship sailed without him the seaman forfeited all wages (and advances) recoverable in any state, city, town or county court.

If the crew were to discover the vessel to be unseaworthy, the Master was required to put into a port where an inquiry could be made for a hearing before a district court or any court of the city, town or place. If the crew failed to maintain its complaint it "shall be lawful for any justice of the peace to commit by warrant ... every such seaman ... to the common gaol of the county, therein to remain without bail until he shall have paid double advanced to him" at the time of signing on. Any person who harbored any seaman knowing him to be a member of the crew, was to forfeit $10 per day for every day he continued to harbor or secrete the seaman. A seaman absent without leave, if entry was made in the log book was to forfeit three days pay for every day of absence. Every seaman was entitled to receive one-third part of the wages at every port and full wages within ten days after the end of the voyage. If a seaman, after signing on, deserted the ship at any place without leave of the Master, any Justice of the Peace was authorized to "issue his warrant to apprehend such deserter." If proved, the "justice [was to] commit him to the house of correction or common gaol ... there to remain until the ship ... [was to] be ready to proceed on her voyage...."

---

**28.** 280 N.L.R.B. 84, p. 4.

**29.** *Id.*

**30.** *Id.*

Every ship of 150 tons or more, on a voyage across the Atlantic Ocean, was also required to provide, for each crew member, "at least sixty gallons of water, 100 pounds of salted fresh meat, and 100 pounds of wholesome ship-bread" under a penalty of an additional one day's wage for every day of short rations.

For these nearly 200 years Congress has continued to legislate [31] for the welfare of seamen, their protection from each other,[32] from unscrupulous Shanghaiiers [33] and shipowners, their Masters and officers. These statutes are so numerous and so detailed that only general reference can be made, leaving to the Appendix greater detail.

These include the early requirement for written Shipping Articles reflecting the seaman's precise engagement to be executed before the newly created office of United States Shipping Commissioner.[34] To carry out the congressional aim of seaman protection Congress created the professional Consular Corps to be stationed throughout the world's maritime ports.[35] Probably the most important are the sweeping statutes on seamen's wages including the now famous two-for-one penalty of two days' wages for each day of unreasonable delay in payment.[36] Central to the elaborate statutory scheme covering the protection of seamen, their duties and

punishment in case of transgression is the provision for official log books.[37]

Equally emphatic was Congress in assuring the essential maintenance of discipline, obedience to the orders of the ship's officers, the severe penalties for desertion, the punishment for disobedience to the orders of an officer, the severe instruction, and sometime prohibition, on the traditional workers right to strike.[38]

### The End of the Voyage

■ At long last we conclude that the two centuries of congressional action concur and given the specialized treatment of seamen, their relation to, and obedience of, commands by their officers and the essential discipline aboard ship in calm or tempestuous times, the Master was entitled to propound all of the questions he asked. The refusal of Dunleavy to answer them other than by his sea-lawyer claim of rights justified the Master in dismissing him from the ship's company.

ENFORCEMENT DENIED.

### APPENDIX (1)

One of the most significant congressional actions was the Shipping Commissioner's Act of 1872.[1] The principal duties of the

---

**31.** The latest is subtitle II, Title 46, Vessels and Seamen. This is a complete revision and reenactment as substantive law. P.L. 98–89, August 26, 1983, 97 Stat. 500 and P.L. 99–509, October 21, 1986, 100 Stat. 1913; *see* H.R. No. 98–338 and H.R. No. 99–398, at 307 (1987 pocket part).

**32.** Possession and use of sheath knives and dangerous weapons forbidden. *See* 46 U.S.C. 11506, § 6:15 and 6:14, M. NORRIS, *The Law of Seamen,* 4th Ed. (1985) hereafter cited as NORRIS. *See* Judge Wisdom's seafaring wisdom in *Fall v. Esso Standard Oil Co.,* 297 F.2d 411, 414, 1962 A.M.C. 951 (5th Cir.1961), *cert. denied,* 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55 (1962).

A useful tool may be a dangerous weapon. Lizzie Borden took an axe. A weapon may be a useful tool. The trial judge cleaned fish with his switchblade knife. But an axe belongs in a tool shed; a seaman cannot bring one aboard ship. A switchblade knife may be appropriate in a fishing box; a messman cannot lawfully bring one aboard ship and, in this case, making matters worse, keep it on a

table near his bunk, presumably for instant use.

**33.** NORRIS, § 10:12.

The old water-front practice of drugging a seaman or plying him with drink to the point of stupefaction and then shipping him out against his will (known as Shanghaiing) was legally barred in 1906.

NORRIS, § 10:12, p. 373. Act of June 28, 1906, ch. 3583, §§ 1–3, 34 Stat. 551. 18 U.S.C. § 2194 (West 1984).

**34.** *See* Appendix (1).

**35.** *See* Appendix (2).

**36.** *See* Appendix (3).

**37.** *See* Appendix (4)

**38.** *See* Appendix (5).

**1.** Chapter 322, 17 Stat. 262.

Shipping Commissioner were engaging and discharging seamen.[2]

As Norris describes it, "in the early years of the 19th Century, the chief hazards of the seaman's life were the dangers of the sea. As time went on and as the seaports grew to great cities, the dangers that confronted [the seaman] on land almost equalled those of the deep. Lying in wait for the mariner were the land sharks, crimps, boardinghouse keepers, and other denizens of the waterfront whose only aim in life seemed to be the separation of the seaman from his money."[3]

Justice Field, speaking of the Shipping Commissioner's Act, stated, it "was designed for the protection of seamen in the merchant service; they had previously been the subject of constant imposition and deception. As a class, particularly those serving as common sailors, they are proverbially improvident, and frequently the prey of unscrupulous landsmen. Soon stripped when in port of their hard earnings, they are generally willing to accept employment on almost any terms. Their necessitous condition often compelled them to submit to harsh contracts which placed them completely in the power of masters of vessels." *Young v. American Steamship Co.*, 105 U.S. (15 Otto) 41, 26 L.Ed. 966, 967 (1881).[4]

The Shipping Commissioner became important because of the statutory mandate for Shipping Articles. Ironically, as Norris points out, the engagement reflected by that most maritime of all maritime contracts—Shipping Articles—is not between shipowner and seaman, but between Master and seaman.[5] Written articles were required as early as 1790.[6] Shipping Articles are required for every foreign voyage from a port in the United States to any foreign port with very limited exceptions.[7] A Master, accepting a seaman for service without signing Articles is subject to a fine of up to $200.[8] The Articles prescribe specifically the voyage and expressly bind the "crew ... to conduct themselves in an orderly, faithful, honest and sober manner; ... obedient to the lawful commands of the master and for which the master binds himself to pay as wages the sum shown in the Articles.[9] The first page of the Articles is to be posted in the crew's living quarters.[10] Reflecting the detailed operational concern for the elemental welfare of seamen, the Articles must prescribe the scale of provisions, including the availability and serving of antiscorbutics.[11]

The seaman, in the presence of the Shipping Commissioner (now the Master) [12] signs the articles reflecting his capacity, (ordinary seaman, fireman, etc.) wages and number in the Continuous Discharge Book.

### APPENDIX (2)

A significant and vital part of this statutory machinery for the advancement and protection of American seamen was the purposeful establishment of a professional Consular Corps with American Consuls stationed in ports around the world. As

2. *See Norris,* § 5:3, p. 155.

3. *Norris,* § 5:2, at 154.

4. *See also Norris,* § 5:2, p. 154.

5. NORRIS, § 6:1, at 176.

6. *Id.,* § 6:2, at 177.

7. *Id.,* § 6:3, at 178, 46 U.S.C. 10301.

8. *Id.,* § 6:5, at 181, 46 U.S.C. 10321.

9. NORRIS, § 6:11, 6:12.

10. 46 U.S.C. § 10307, NORRIS, 6:23.

11. NORRIS, § 6:16 and 6:17, at 190–191. An oceangoing vessel must maintain a sufficient quantity of lime or lemon juice, sugar and vinegar. The Master must serve the antiscorbutics to the crew within ten days after salt provisions have been served out to the crew and thereafter as long as salt provisions continue. Failure to carry the antiscorbutics subjects the Master and owner to a fine up to $500; failure to serve warrants a penalty up to $100.

12. The office of Shipping Commissioner was effectively abolished by an appropriations statute. *See* Norris, § 5:1. It was phased out effective December 3, 1979 by an appropriation bill, Department of Transportation, FX80 Appropriation Act (Pub.L. 96–131, *see* NORRIS p. 144) Articles must now be signed before the Master or a Consul in foreign ports.

Judge Ware stated in *Hutchinson v. Coombs,* Fed. Cas. No. 6955 (D.C.Me.1825):

> [E]very maritime nation has a deep interest in the protection and preservation of its seamen, as a class of men of indispensable necessity, for the purposes both of peace and war. Their preservation, therefore, for the service of the country, becomes an object of public policy. The policy of the United States, in this respect, is very distinctly marked.

Consuls have the duty of hearing and taking action on complaints of seamen[13] concerning seaworthiness of their ship, adequacy of provisions, improper equipment, undermanning. The Consul may appoint surveyors and make determinations.

### APPENDIX (3)

One of the most decisive indicators of congressional concern for the welfare of seamen and the regulation of shipowners as employers is the treatment of seamen's wages and their prompt payment. One of the most spectacular is the historic statutory two-for-one penalty of two days pay for every day's unreasonable delay in payment of earned wages. "As early as 1790 Congress in legislating for the benefit of seafarers provided that masters ... of vessels ... should pay to every seaman his wages within two days...." (footnotes omitted).[14] After reducing the penalty by amendments of 1898, to one day's pay with a maximum of ten days, the Seaman's Act of 1915 "changed the penalty to two days' pay for each day of the delay and plummet-

ed the limitation to ten days."[15] The contemporary statute[16] requires payment in full of earned wages within a specified time plus two days additional pay for each day payment is delayed without sufficient cause. There is a similar penalty for failure to pay half of the amount of earned wages at each port of call during the voyage.

So pervasive was the congressional policy determination that these sections were specifically made applicable to seamen on foreign vessels while in American ports. The severity, in both meaning and application, is spectacularly illustrated by the Supreme Court's decision in *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) in which failure to pay $412.50 in wages subjected the shipowner to an ultimate judgment of more than $300,000.

### APPENDIX (4)

There are few documents aboard a vessel more important than the log books. "The maintenance of an official log book is mandatory, and is required by law."[17] The official log book is a government document issued by the United States Coast Guard. The first two pages contain excerpts from congressional acts pertaining to entries to be made for various offenses for which seamen may be punished.[18] Entries are to be made by the Master and signed by the Master and by the mate or some other member of the crew. Entries must be

---

**13.** *See* NORRIS, § 3:7, at 93

> A consular officer is regarded as an advisor and counselor of the seaman and if any consul has reason to believe that a seaman is in any difficulty ... it is his duty to investigate at once and to take appropriate action.
>
> The right of American seamen to present their complaints before the representatives of their government has long been considered an important one for the purpose of protection and relief of the mariner. This right was secured to every American seaman as early as 1840.

(Citations and footnotes omitted). *See also* Act of July 20, 1840, 5 Stat. 394, ch. 48.

> Of the Act of 1840, Judge Sprague declared: If the consul be an upright and independent officer, it may be of administrative value to the oppressed and freeless mariner in distant

regions. It may be called the habeas corpus of the seaman, and the Court will carefully and vigorously guard its inviolability.
*Morris v. Cornell,* Fed.Cas. No. 9829 (1843, D.C. Mass.).

**14.** NORRIS, § 17:1, p. 510.

**15.** *Id.* p. 511.

**16.** *See* 46 U.S.C. § 10504 for coastwise vessels. For those in foreign trade, *see* §§ 10313(e), (f) and (g)).

**17.** NORRIS, § 7:1. 46 U.S.C. §§ 11301, 11302, 11501, 11502, formerly, 46 U.S.C. §§ 201, 202, 203.

**18.** NORRIS, § 7:2.

made as soon as possible after the occurence. This is subject to a penalty up to $200 against the Master for each failure to keep and make entries in a timely and proper manner. For handling of offenses committed by seamen (*see* 46 U.S.C. § 11501), an entry "shall be made in the vessel's official log book—(1) on the date of the offense; (2) stating the details; (3) signed by the Master; and (4) signed by the chief mate or another seaman." [19] The Master, under § 11301(b) "shall make ... in the official logbook the following entries: [20] (1) each legal conviction of a seaman of the vessel and the punishment inflicted. (2) Each offense committed by a seaman of the vessel for which it is intended to prosecute or to enforce ... (3) Each offense for which punishment is inflicted on board and the punishment inflicted." [21]

### APPENDIX (5)

Recognized as an anomaly in relations of master and servant is the maritime concept of the restricted freedom of a seaman which the Supreme Court acknowledged in *Robertson v. Baldwin*, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897).

From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at someplace where seamen are impossible to be obtained—as Molloy forcibly expresses it, "to rot in her neglected brine." Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage,

and, in some cases, the safety of the ship itself.

Desertion resulted in ancient days in death, later, since 1915, in imprisonment up to three months, and now, in forfeiture of all wages and efforts. The seaman, today, is perhaps the only workingman in the United States who can be lawfully punished by forfeiture of his earned wages and clothes for quitting his job before the expiration of his contract. Related to this is disobedience of an refusal to obey the order of the ship's officers. [22]

If a seaman disobeys, and stirs up others to join, this may amount to unlawful revolt, a crime under 18 U.S.C. § 2192, 2193. [23] The traditional right to strike is severely restricted and often times prohibited outright. *See* e.g., quitting ship without leave at the final port of discharge. 46 U.S.C. § 11503(3). And a strike is mutiny subject to criminal penalties. NORRIS at 8:40.

Also unlike traditional land based employment, willful damage to the vessel, its cargo or stores subjects the seaman to civil and criminal sanctions. NORRIS § 14:12, 14:13.

The need for accountable discipline aboard ship was early recognized. Judge Sprague has described the authority of the master over the seamen and the means given to enforce discipline in the following terms: [24]

This authority is conferred for the preservation of the lives and property committed to his care, and is often as essential to the safety of the crew, as of the officers and ship. Hence the law has ever required of the seaman prompt and respectful obedience to all lawful orders of the captain. Even though the captain be in the wrong, or gives his orders in a harsh and insolent manner, or punishes without sufficient cause, still the seaman, while at sea, must submit to the

---

**19.** Section 11502.

**20.** Entries to be Made Promptly and failure promptly to make void court prosecution of offenses, *see the St. Paul,* 133 F. 1002 (D.C.N.Y. 1904).

**21.** NORRIS, § 7:4, 7:7.

**22.** *See* e.g., the statutory provisions pointed out in notes 9, 11 and 20.

**23.** NORRIS, 10:27, 10:13, 10:27.

**24.** *See* NORRIS § 10:31.

wrong, and wait for redress till his return to port, rather than resort to violence, unless the wrong threatened to be done will work an irreparable injury. If the wrong threatened or done is such that it can wait for redress, the seaman is bound to wait, and will not be excused for forcible resistance to official authority. For the use of this unusual power, the captain is amenable to the law; and for all abuse of it, whereby a seaman suffers, a remedy is provided upon his return to his country.