United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 25, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-60947

_____

SANDERSON FARMS INC, Production Division
                    Petitioner-Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD
                    Respondent-Cross-Petitioner

_____

Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board
Agency No. 15-CA-16450

_____

Before KING, Chief Judge, and SMITH and EMILIO M. GARZA, Circuit
Judges.

PER CURIAM:[*]

    Sanderson Farms, Inc. ("Sanderson"), Petitioner-Cross-

Respondent, was the subject of an unfair labor practices

complaint brought by the union representing the employees at one

of its facilities.  Upon investigation, the General Counsel of

the National Labor Relations Board ("NLRB" or "Board"),

Respondent-Cross-Petitioner, filed a complaint against Sanderson

alleging violations of the National Labor Relations Act ("NLRA"

or "Act").  Following a hearing, an Administrative Law Judge

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("ALJ") found Sanderson liable and issued an order directing Sanderson to take certain remedial measures. Sanderson appealed the decision to the full Board, which affirmed the ALJ's decision. Sanderson now petitions for review of the Board's decision. The Board cross-petitions for enforcement of its order. We DENY the petition for review and GRANT the cross-application for enforcement.

## I.  FACTUAL BACKGROUND

Sanderson is a processor and distributor of poultry products with facilities throughout Mississippi and Texas. One of its facilities is in Magnolia, Mississippi. In July 2001, Bill Noland, a truck driver at the Magnolia facility, along with several co-workers, contacted the United Food and Commercial Workers Union, Local 1529 ("Union") about beginning an organization campaign at the facility. The organization efforts took place throughout July and August. On September 13, 2001, the NLRB supervised an election in which the employees at the Magnolia facility voted 45 to 3 to select the Union as their collective-bargaining representative.

On October 17, 2001, Keith Wicker, a former driver for Sanderson who had been recently rehired, met with Personnel Supervisor Derek Fletcher to fill out some paperwork relating to his re-employment. During this meeting, Fletcher and Wicker

2

discussed the recent union election.[1]  Fletcher asked Wicker whether he was for or against the Union.  Wicker replied that he was indifferent.  Fletcher told him that if he did not want to become involved with the Union, he should stay away from Noland.

At some point in that same month, Scott Boyd, another former truck driver, spoke with Lee Gill, a supervisor at the facility, about returning to work.  Boyd was particularly concerned that his thirteen traffic tickets would bar his reemployment.  Gill responded to Boyd's inquiry by discussing the problems Sanderson was having with the Union.  Boyd made clear that he was only concerned with getting a job and was not interested in the Union.  Gill responded to this statement by telling Boyd to report for work the following Monday.

Once he began work, Boyd started complaining about the system Sanderson used to assign work.  Soon thereafter, Boyd met with Fletcher and Bill Putnam, the Division Manager, to air his grievances.  Putnam told Boyd that the problems were related to the Union and that Sanderson was trying to "weed out [the] troublemakers" who were causing the problems.

On October 29, 2001, six-and-a-half hours into his eight hour shift, Noland was called back to the plant by Fred Jones,

---

[1]  The exact nature of this conversation was disputed at trial.  Fletcher maintains that Wicker initiated the conversation about the Union, while Wicker claims that Fletcher brought up the subject.  The ALJ determined that Wicker was more credible and chose to credit his testimony.  This credibility determination is one of several we are called upon to review in this appeal.

the facility's dispatcher.  Jones informed Noland that his regular truck was scheduled for maintenance work.  Noland requested another truck so that he could complete his work day.  Noland testified that Jones told him truck number 4155 was available but "would not pull."  This meant that it would not be able to haul a fully-loaded trailer.  After inspecting truck 4155 and "weighing the odds," Noland returned to Jones rather than taking his chances with the notoriously undependable truck 4155.  According to Noland, Jones gave him permission to leave work for the day since no equipment was available.  Noland then clocked out and went home.

 For the next week, Noland reported to work as usual without incident.  However, when Noland reported to work on November 6, his timecard had been pulled.  Noland went to Fletcher's office to find out what had happened.  They were soon joined by Putnam and Gill.  Noland was informed that by leaving work early the previous Tuesday, he had incurred an unexcused absence, his fifth within six months.  He was also reminded of the company policy that mandates an employee's discharge for five unexcused absences within any rolling six-month period.  Noland told his supervisors that no equipment was available for him at the end of his shift on October 29 and that Jones had given him permission to leave for the day.  Gill told Noland that they would take the day to check on the status of truck 4155 and would let Noland know where he stood by the end of the day.  Later in the day, Noland was

4

called back into the office.  Citing the five unexcused absences, Fletcher told Noland that his employment was terminated.

## II.  PROCEDURAL BACKGROUND

Following Noland's dismissal, the Union filed an unfair labor practices complaint with the NLRB.  This prompted the Board's General Counsel to bring a formal complaint against Sanderson.  The complaint alleged that Noland's termination, as well as management's separate conversations with Wicker and Boyd, violated § 8(a)(1) & (3) of the NLRA.  29 U.S.C. § 158(a)(1) & (3) (1998).  Section 8(a)(1) states that employers may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act.  Section 8(a)(3) states that employers may not discriminate "in regard to hire or tenure of employment . . . to encourage or discourage membership in any [union]."

On September 16 and 17, 2002, the charges against Sanderson were heard in a trial held before the ALJ.  The ALJ found that the October 17 meeting between Wicker and Fletcher constituted a coercive interrogation in violation of § 8(a)(1).  The ALJ also found that the meeting between Boyd, Fletcher, and Putnam in late October constituted a violation of § 8(a)(1).  The ALJ held that the threat to weed out troublemakers made during this meeting was a threat to discharge employees who supported the Union. Finally, the ALJ determined that Noland's discharge violated

§ 8(a)(3), since the attendance policy was not consistently enforced.  The ALJ issued a recommended order that forced Sanderson to reinstate Noland with backpay.  The ALJ also ordered Sanderson to cease-and-desist from further violations of the Act.  Finally, Sanderson was ordered to post a notice at the Magnolia facility informing employees of their rights under the Act and that Sanderson had violated those rights.  In coming to these conclusions, the ALJ made specific credibility determinations crediting the testimony of several employees over the testimony of Sanderson's management.

Dissatisfied with the ALJ's findings, Sanderson appealed the decision to the Board.  The Board largely affirmed the ALJ's conclusions.  The Board agreed with the ALJ that management's conversations with Wicker and Boyd constituted violations of § 8(a)(1).  It also agreed that Noland's discharge constituted a violation of § 8(a)(3).  However, its rationale on this charge differed slightly from that of the ALJ.  Rather than focusing on disparate treatment, the Board instead found that Noland did not incur a fifth unexcused absence on October 29, 2001.  As such, he was wrongfully terminated.  With minor modifications, the full Board issued the recommended order.  Sanderson now petitions for review of the Board's decision.  The Board cross-petitions for enforcement of its order.

## III.  STANDARD OF REVIEW

6

Section 10(e) of the NLRA states that on appeal, the Board's factual determinations are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1994).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229 (1938)).  Beyond purely factual determinations, this deference also extends to the Board's application of law to fact.  Valmont Indus., Inc. v. NLRB, 244 F.3d 454, 463 (5th Cir. 2001) ("The standard of review of the Board's findings of fact and application of the law is deferential, as both parties recognize.").  This means that a reviewing court may not displace the Board's choice between two fairly conflicting views, even if the court "would justifiably have made a different choice had the matter been before it de novo." Universal Camera, 340 U.S. at 488.

This generally deferential stance clearly applies to the two main determinations we are called upon to review in this case. This court has made clear that when an ALJ faces contradictory testimony, his credibility determinations will generally not be disturbed.  NLRB v. Brookwood Furniture, 701 F.2d 452, 456 (5th Cir. 1983) ("Particularly where, as here, the record is fraught with conflicting testimony, requiring essential credibility determinations to be made, the trier of fact's conclusions must

7

be accorded particular deference."). Such determinations will only be disturbed where they are inherently unreasonable or self-contradictory. NLRB v. Delta Gas Inc., 840 F.2d 309, 311 (5th Cir. 1988).

This deference also extends to a Board determination that an interrogation or threat was coercive. This court has previously stated that "[b]ecause the question whether [a] coercive interrogation has occurred is one of fact, its primary determination rests with the Board, and we accord great deference to that body's findings." NLRB v. Great Western Coca-Cola Bottling Co., 740 F.2d 398, 404 (5th Cir. 1984) (internal quotation marks omitted).

## IV. ANALYSIS.

### A. Interrogation of Scott Boyd as a violation of NLRA § 8(a)(1)

In its brief, the Board urges us to affirm summarily its finding that Putnam's statement to Boyd about weeding out troublemakers was an unlawful threat made in violation of § 8(a)(1). The Board argues that Sanderson waived the issue on appeal because it failed in its original brief to address the conversation as it relates to liability under § 8(a)(1). This circuit has made clear that when a company does not challenge in its brief the NLRB's findings of a violation of § 8(a)(1), that issue is waived on appeal and the Board is entitled to summary enforcement. NLRB v. Brookshire Grocery Co., 919 F.2d 359, 363

n.2 (5th Cir. 1990); NLRB v. Jacob E. Decker & Sons, 569 F.2d 357, 360 (5th Cir. 1978).

In its original brief, Sanderson clearly does discuss Putnam's comment about weeding out troublemakers. However, it only discusses that comment as it relates to the issue of anti-union animus relevant for proving a § 8(a)(3) violation. Nowhere does it contest the Board's finding that Putnam's comment was an unlawful threat. Accordingly, that portion of the Board's order dealing with § 8(a)(1) liability arising from Putnam's comment is summarily enforced.

B. Interrogation of Keith Wicker as a violation of NLRA § 8(a)(1)

The NLRB found that the meeting on October 17, 2001 between Wicker and Fletcher was a coercive interrogation. Before considering whether the meeting was coercive, we must deal first with the threshold inquiry of whether it was an interrogation. Sanderson claims that because it was Wicker, and not Fletcher, who brought up the issue of the Union, it is not fair to categorize the conversation as an interrogation. This argument is unavailing. During the trial, there was conflicting testimony as to whether Wicker or Fletcher broached the issue of the Union. Both men claimed that the other first raised the issue. The ALJ explicitly found Wicker's testimony more credible. Absent inherent unreasonableness, which is not present here, we will not question that credibility determination. We will take it as

9

given that Fletcher was the one who first discussed the Union. Accordingly, the October 17 meeting did constitute an interrogation.

To determine whether an interrogation was coercive, courts in the Fifth Circuit follow the Bourne test. Bourne v. NLRB, 332 F.2d 47 (2d Cir. 1964); see also NLRB v. Brookwood Furniture, 709 F.2d 452, 460-61 (5th Cir. 1983) (applying the Bourne factors in the Fifth Circuit). This test sets out eight indicia of coercion: (1) the history of the employer's attitude towards its employees; (2)the nature of the information sought; (3) the rank of the questioner in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of the employee's response; (6) whether the employer had a valid purpose in obtaining the information sought; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals would be forthcoming. Bourne, 332 F.2d at 48. These factors do not set out a strict test. Rather, they are merely issues to consider in assessing the totality of the circumstances.

Even a cursory analysis of these factors makes clear that there was substantial evidence to support the Board's conclusion. Regarding factor two, the information Fletcher sought would have allowed him to know whether Wicker would be disposed toward exercising his rights under the Act. This would give Fletcher direct knowledge as to whether Wicker would be amenable to

10

coercion. As for factor three, Fletcher was a senior member of the management team at the Magnolia facility. Fletcher was also questioning Wicker in the very same office in which employment decisions were made. This makes the place and manner of the conversation, factor four, highly suspicious. Sanderson claims that the timing of the conversation undercuts the claims of coercion. Since Wicker had already been hired, Sanderson argues, there was no reason for him to feel threatened. However, he could have reasonably believed that his chances of keeping his new job would be impacted by his potential union activities.

Regarding factors six and seven, it is clear that there was no valid purpose for the conversation. Sanderson claims that Fletcher was merely trying to be helpful in letting Wicker know that if he wanted to avoid the Union, he should stay away from Noland. Perhaps if Wicker had explicitly stated that he wanted to avoid becoming involved in the Union, this rationale would make sense. However, the fact that it was unsolicited makes it highly suspicious. Furthermore, in obstinately refusing to accept the determination that Fletcher first broached the topic of the Union, Sanderson has failed to proffer any reason, valid or invalid, as to why the topic of the Union should have ever come up in the first place. Finally, with respect to factor eight, the warning to stay away from Noland could reasonably be interpreted as a veiled threat to stay away from the Union. This

does nothing at all to assure the employee that reprisals will not be forthcoming.

We are convinced that the evidence described above, discussed at length in both the ALJ's and the full Board's opinions, is more than sufficient to show that the totality of the circumstances made the October 17 meeting a coercive interrogation.  Given our deferential standard of review, we have no justification for disturbing the Board's determination that the meeting constituted a coercive interrogation in violation of § 8(a)(1) of the Act.

C.  Discharge of Bill Noland as a violation of NLRA § 8(a)(3).

It is unquestioned that an employer violates § 8(a)(3) when it discharges an employee because of his union activity.  NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 397-98, 401 (1983); NLRB v. Delta Gas, Inc., 840 F.2d 309, 311 (5th Cir. 1988).  To establish a prima facie case of retaliatory discharge, the Board must provide evidence that would support a reasonable inference that the employer's adverse employment action was motivated by anti-union animus.  Transp. Mgmt. Corp., 462 U.S. at 400; Delta Gas, 840 F.2d at 311.  In this case, Sanderson's two § 8(a)(1) violations are more than adequate to show anti-union animus. Putnam's comment about weeding out troublemakers supports an inference that Sanderson wished to rid itself of the Union's leaders.  Fletcher's warning to Boyd to stay away from Noland

12

supports an inference that Sanderson viewed Noland as one of the Union's leaders.

Once the prima facie case has been made, an employer can rebut that case by demonstrating that the adverse employment action would have taken place irrespective of union activity. Transp. Mgmt. Corp., 462 U.S. at 401-03; Delta Gas, 840 F.2d at 311. In citing its attendance policy, this is exactly what Sanderson has done. However, where this legitimate reason is shown to be a pretext, the prima facie case has not been rebutted. Noland claims that on October 29, dispatcher Jones told him he could leave work early since no equipment was available for Noland to use. If this did indeed occur, then Noland's absence on that morning would have been excused. Since he did not violate the attendance policy, his discharge must then be deemed pretextual. Sanderson and Jones deny that Noland was given permission to leave early. They also cite evidence tending to show that truck 4155 was available and operational on the morning of October 29. Sanderson's emphasis on the availability of truck 4155 is beside the point. If Jones told Noland that it was nonoperational and that Noland could leave, Noland was entitled to rely on Jones. The critical inquiry is what Jones said to Noland on that morning. On this matter, there is conflicting testimony. Based on what he heard at the trial, the ALJ determined that Noland was more credible and thus accepted his account of what happened on that morning. As with Wicker's

13

testimony, absent inherent unreasonableness, we refuse to disturb the ALJ's basic credibility determination.  For this reason, we find that substantial evidence supported the Board's conclusion that Noland did not incur a fifth unexcused absence and was therefore wrongfully terminated and its ultimate conclusion that Sanderson's dismissal of Noland violated § 8(a)(3).

## V.  CONCLUSION

For the foregoing reasons, we DENY Sanderson's petition for review and ENFORCE the Board's order.